# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

RUN PETER CHHOUN,
Defendant and Appellant.

S084996

San Bernardino County Superior Court
FSB08658

February 11, 2021

Justice Corrigan authored the opinion of the Court, in which
Chief Justice Cantil-Sakauye and Justices Liu, Cuéllar,
Kruger, Groban, and Kim[*] concurred.

---

[*]     Associate Justice of the Court of Appeal, Second Appellate
District, Division Five, assigned by the Chief Justice pursuant
to article VI, section 6 of the California Constitution.

PEOPLE v. CHHOUN

S084996

Opinion of the Court by Corrigan, J.

During a home invasion robbery, defendant Run Peter Chhoun and fellow gang members killed the entire Nguyen family except three-year-old Dennis. The child was wounded and left alone overnight with the bodies of his parents and siblings. Defendant was tried with alleged accomplice Samreth Pan. The court dismissed all charges against Pan at the close of the People's case. Defendant was convicted of five counts of murder, one count of residential burglary, and three counts of residential robbery with enhancements for personal use of a firearm.[1] He was acquitted of the attempted murder of Dennis. The jury found true special circumstances of murder during burglary and robbery and the murder of multiple victims.[2] It set the penalty at death. We affirm the judgment.

---

[1]  Penal Code sections 187, subdivision (a), 459, 211, 12022.5, subdivision (a). Although the jury found the personal use allegation true for the residential burglary and robbery charges, it determined the allegation had not been proven for the murder charges.

[2]  Penal Code section 190.2, subdivision (a)(17) and (a)(3). All further statutory references are to the Penal Code unless otherwise specified.

## I. BACKGROUND

### A. *Guilt Phase*

In the summer of 1995, defendant (nicknamed "Chaka") and Pan (nicknamed "Rusty") were "shot callers" and "O.G.s"[3] in the Tiny Rascals Gang (TRG). Vinh Tran ("Scrappy") and William Evans were junior members. Although not officially a member of the gang, Nhung Tran ("Karol") "took care of" young girls who associated with TRG members. All five were originally charged together. Because Scrappy and Evans were juveniles, however, their cases were later severed, as was the case against Karol.[4] Evans and Karol testified at trial pursuant to plea agreements.[5]

---

[3] The term "O.G.," which stands for "original gangster," is generally used as a term of respect for older or veteran gang members. In Asian gangs, the label is awarded based on experience level rather than age. Even young gang members may rise to leadership if they accrue sufficient criminal experience. O.G.s typically advise younger members how to plan and carry out crimes, and how to evade detection. A "shot caller" is a respected gang member who plans how a specific crime will be committed.

[4] Although they share the same last name, Vinh (Scrappy) and Nhung (Karol) Tran are not related. To avoid confusion, we refer to them as "Scrappy" and "Karol," as they were consistently referred to in the trial court.

[5] Karol pled guilty to five counts of second degree murder, with a sentence of up to 50 years in prison. Evans pled guilty to five counts of first degree murder, with a sentence of 25 years to life in prison. Evans's plea agreement also encompassed charges in a Sacramento case. (See *post*, at pp. 6–8.) In exchange for pleading guilty to the Sacramento crimes and testifying truthfully in both cases, Evans's 25-year-to-life sentence in the Sacramento case could be served concurrently with his sentence for these San Bernardino murders.

### 1. *Elm Street Home Invasion Robbery and Murders*

In late July, defendant asked Karol if she knew a good place to rob. Karol described a family in San Bernardino who were likely to have cash and jewelry in the house. She believed a husband and wife lived there with a child and grandmother. Karol said the family would be a good target because they were Vietnamese and, she believed, would not call the police.

Although Karol did not want to be part of the robbery because her parents lived nearby, defendant ultimately persuaded her to join him. He also recruited Evans and Scrappy, and the crime took place on August 9. Defendant had a Glock nine-millimeter pistol but wanted a second gun. He drove the group to Pan's house. He told Pan they were on their way to commit a robbery and asked for Pan's gun. Pan said he did not want to be involved but provided a Glock pistol, which defendant handed to Scrappy.

Defendant drove to the target house on Elm Street. Karol was to approach the front door because she knew the residents. While she knocked, Scrappy stood behind a bush, armed with Pan's gun. When Henry Nguyen[6] answered the door, Scrappy rushed inside, followed by defendant and Evans. Karol fled to defendant's red Honda, which he had parked outside.

The Nguyens did not understand English, and Scrappy was the only robber who spoke Vietnamese. Defendant gave orders that Scrappy translated to the family. Initially, Henry, his wife, Trinh Tran, and their 13-year-old daughter Doan were the only family members in the living room. Scrappy appeared

---

[6]     To avoid confusion, we refer to members of the Nguyen family by their first names.

with three children from another room: 11-year-old Daniel, 10-year-old David, and 3-year-old Dennis. Everyone was ordered to get on the floor. Evans searched the house while Scrappy demanded cash. Henry said they had none, but when defendant threatened Dennis with a large knife Henry turned over about $2,000. When Daniel volunteered that he had some money in his bedroom, Evans followed him into a hallway. Evans heard a gunshot and returned to the living room, to see Henry lying facedown. Defendant stood less than a foot away holding a gun. At defendant's order, Evans left the house and sat in the car with Karol. Both reported hearing several gunshots from inside the house. Karol estimated the robbers had been in the house about 15 minutes before the first shots were fired. A neighbor heard several gunshots and saw a car drive away.

Defendant drove the group to Karol's house. In the car, defendant remarked, "It must have been the wrong house," because there was no grandmother and the family did not have as much money as he had expected. He said five people had been killed. He handed Scrappy a gun, directing him to unload it. Later, he told Karol he had held "the little boy" at knifepoint trying to get more money from the mother. Pan was waiting at Karol's house, and defendant returned his pistol. Learning of the murders, Pan became extremely angry and called the group stupid. Defendant doled out cash to everyone but Pan. They also divided some of the Nguyens' jewelry. Defendant told everyone to "act like nothing's happened," and they spent the rest of the evening at a pool hall. Defendant told other gang members he had done some of the shooting at the Elm Street house. He was also overheard saying that "Scrappy went crazy and shot a kid."

The next morning, Henry's sister called the Nguyen home. The phone rang for a long time. Dennis finally answered and said, "Mommy's dead." Karol's mother went to the house and heard Dennis crying inside. He finally opened the door and then sat next to his mother's body. Henry, Trinh, and David lay dead on the living room floor. Toothpaste had been smeared around Trinh's nostrils, mouth, and eyes, the tube discarded near her body. Another neighbor found Doan and Daniel lying dead in a bedroom. All had been shot repeatedly. Dennis was holding his brother's head and "just crying, screaming."

Dennis had been shot in the hand. Henry was shot in the head and neck. One shot was fired with the gun's muzzle placed directly against his skull. He was also shot in the chest at close range while lying on the floor. Four superficial cuts on the back of his neck had been inflicted by a sharp object, like a knifepoint. Trinh was shot once in the thigh and twice in the head, at very close range. Two of her teeth were detached by the force of the bullets. The oldest child, Doan, was shot in the leg, chest, and head. Another bullet pierced a hand that she had held up to protect her face. Daniel was shot in the lower leg and chest. David was shot twice in the chest and once in the back of the head.

Several nine-millimeter cartridge cases and spent bullets were found in the living room. Trinh's emptied purse was found in the hallway. A meat cleaver rested atop the stereo cabinet. More casings and rounds were recovered near the victims in a bedroom. Fourteen of the fired casings were Winchester, and one was S&B brand. All were fired from the same Glock nine-

millimeter pistol.[7] No fingerprints matching the gang members were found in the house, but a latex glove was discarded in the backyard.

Shortly after the crimes, defendant told Jonathan Ibarra that he had committed the robbery. He said five people were killed but "somebody fucked up in the house and one got away." He shot that one in the arm. Ibarra had seen both defendant and Pan with nine-millimeter Glock pistols around the time of the murders. Defendant later told a jail inmate that Scrappy had squirted toothpaste in a woman's face during the robbery. He said it was poison and ordered the family to "[t]ell him where the fuckin' money is or she's going to die."

### 2. Sacramento Home Invasion Murders

Defendant and other TRG members were linked to a home invasion incident in Sacramento almost two weeks before the Elm Street crimes. Jurors were admonished that the Sacramento evidence was admitted for a limited purpose to show "a common scheme, motive, or knowledge" bearing upon the intent of defendant and Pan to commit the Elm Street murders.

Defendant, Pan, Scrappy, and Evans drove to Sacramento and met with other TRG members to plan a robbery. Bunjun Chhinkhathork (nicknamed "Puppet") suggested robbing an apartment where the owners sold cigarettes and other items. On the evening of July 27, 1995, defendant drove to a park then

---

[7]     After the evidence was presented in the guilt phase, another ballistics examination determined one bullet had been fired by a different gun, which was also a Glock nine-millimeter.

led Pan and Evans through a fence to the residence. He told Chhinkhathork to stay in the car as the getaway driver.

Quyen Luu and her husband, Hung Dieu Le, operated a small store in their home. Their 17-year-old daughter Amie was sitting on the stairs of the building when defendant, Pan, and Evans approached. One pointed a gun at her and gestured for her to follow. Instead, she yelled for her mother to close the door and ran upstairs to a neighbor's apartment, where her brother Vincent and sister Mei were visiting. The Le family was just finishing dinner when a robber entered. He struggled with Quyen, shooting her in the leg, then shot Hung and his father, Nghiep Thich Le, several times. The parties stipulated that 47-year-old Hung died of a gunshot to the chest, and 73-year-old Nghiep was killed by a shot to the head.

Evans testified that defendant went into the apartment alone. When the three returned to the car, Chhinkhathork drove away. Defendant said he shot "the lady" because she tried to grab him. He also shot a man who had tried to hit him with a chair. He later joked to Karol about the "stupid guy" who thought he could "stop a bullet with a chair." After the incident, defendant drove Evans and other TRG members back to San Bernardino. They acquired no money in the attack.

None of the survivors could identify the attackers, but all said only one man held a gun and did the shooting. About an hour before the robbery, a different man had come to the apartment, bought candy, then joined the eventual shooter. They drove off together in a Honda Accord with a damaged front fender. The car, registered to Pan's mother, was recovered with live nine-millimeter rounds in the trunk. All shell casings recovered from the apartment had been fired by the same Glock

nine-millimeter pistol.  It was a different gun from the one used in the Elm Street killings.

### 3. *Investigation*

A detective tried to interview Dennis in the emergency room, but the child was too upset to answer questions.  The following week, assisted by a child psychologist, police were able to obtain a statement.  Dennis said his father answered a knock at the door and three men entered.  One put a gun to his father's head and demanded money.  Another took necklaces from Dennis and his mother.  Everyone was ordered to "get down." His father was shot in the head, and one of the men also shot Dennis in the hand.  The men left by a rear door.  Dennis thought the robbers all had black handguns.  They did not wear masks.

Shortly after the Elm Street murders, defendant visited his girlfriend in Seattle.  Evans and Scrappy joined him. Defendant needed to borrow gas money for the drive home and produced a jade pendant to be held as collateral.  The necklace was later recovered and belonged to Trinh, who had been wearing it at the time of the robbery.

Defendant, Evans, and Scrappy left Seattle, stopping in Sacramento, where they were arrested.  A Glock nine-millimeter shell casing was recovered from defendant's car and linked to the gun used at Elm Street.  Defendant denied involvement in those murders.  As to the Sacramento crimes, he admitted telling a girl outside the home to "shut up," but claimed he had stayed outside the apartment and ran away when he heard gunshots.  Pan told the police a similar story.

### 4. Expert Testimony

Sergeant Marcus Frank of the Westminster Police Department testified as an expert on Southeast Asian gangs. He described the gangs as loosely organized, with leadership roles given to those with the most criminal experience. To become an O.G. or shot caller, members must have committed certain felonies. Unlike western gangs, Asian gangs do not claim a geographic territory and tend to be highly mobile. TRG had over 1,000 members nationwide, with nearly 800 of them in California, ranging in age from 11 to 25. In Southern California, about half its members are Vietnamese and half Cambodian. Females are limited to supporting roles. Only the males are allowed to hold guns and commit robberies or car thefts.

Home invasion robberies are a hallmark of Asian street gangs. In the late 1970s, Vietnamese gangs in Orange County developed the practice, which had previously been rare. These are complex crimes, with specific jobs typically assigned to different members. The gangs frequently target Asian families. Because valuable jewelry is a symbol of the family's wealth and community standing, jewelry is often kept at home, where it can be easily accessed. Many in the Southeast Asian community are reluctant to cooperate with police. The gangs understand this and know how to intimidate victims to hinder investigations. Guns are often used to terrorize victims but, while threats are common, it is unusual for home invasion robberies to result in murder. Typically, gang members manipulate the most vulnerable victim, assaulting the youngest or the oldest family member until someone discloses where money and jewelry are kept. A nonfatal shot may be fired to secure group compliance.

B. *Penalty Phase*

1. *Aggravating Evidence*

In the penalty phase, the prosecution offered more evidence about the Sacramento incident along with defendant's additional murders and violent behavior in custody.

a. *Additional Sacramento Evidence*

A medical examiner testified based on autopsy reports and photographs that 47-year-old Hung Le died from a single gunshot to the chest, fired at "apparently distant range." He would have died quickly. The second victim, 73-year-old Nghiep Le, was shot in the arm and directly in the face, with the bullet entering through the upper lip.

b. *Spokane Home Invasion Robbery and Murders*

A little over two weeks before the Sacramento murders, defendant committed another home invasion robbery with murders in Spokane, Washington. Police interviewed one of the survivors, four-and-a-half-year-old Joe Hagan, Jr. Portions of his account were read to the jury. Joe said that when his mother opened the door the robbers entered with a knife and a gun. They tied up his parents and pushed them to the floor. The robbers cut both his parents on the face or neck. Joe heard gunshots but was afraid and covered his head with a pillow. He ran to his father and tried to wake him and then held his sister on the couch until the next morning, when he went to alert the neighbors. The robbers took jewelry from him and his sister before they started hurting his parents. Shown a photo array, Joe immediately pointed to defendant, saying he was positive it was the person who had hurt his dad. Defendant was the larger

of the two attackers. About a year later, Joe identified a photograph of Giao Ly as the second robber.[8]

Spokane police responded around 7:30 the next morning to find the bodies of 27-year-old Johnny Hagan, Jr., and 23-year-old Thi Hong Nga Pham. Pham's hands were tied with phone cord, and speaker wire was wrapped around her neck. She was shot in the head, face, and chest. The face and the chest shots came from close range. Pham's jaw was broken in two places; she had also been cut several times in the face and neck. A wedding ring and engagement ring were found inside her mouth. Hagan had also been bound with phone cord and speaker wire. He was shot in the ear, at the base of the skull, and through the back of the head. Two shots were fired from only an inch or two away. Hagan had bruising and a cut across the front of his neck. Officers found a bloody knife on a counter and several shell casings from a .45-caliber automatic near the bodies. Giao Ly's palm print was found on a kitchen cupboard, and defendant's fingerprint was lifted from inside the apartment door. Defendant denied ever being in the residence and could not explain why his fingerprint was found there. Evans recalled seeing a .45-caliber gun at defendant's house.

Defendant's girlfriend, Champa Onkhamdy, testified defendant visited her in Portland in early July 1995. They drove to Spokane with Ly, whom she knew as "Sandman," and Kunthea Sar, also known as "Precious." The women stayed at an apartment while defendant and Ly went out. The men returned with jewelry and cash, which they divided among

---

[8] When shown the photographic lineups again during trial, Joe could not recall which photos he had selected and could no longer identify defendant or Ly.

themselves and one or two others. A police officer testified that Onkhamdy reported hearing the men discuss a murder. She disavowed the statement at trial, however, saying the men were speaking Cambodian, a language she did not understand. Before defendant flew back to San Bernardino, he gave Onkhamdy five rings and a bracelet. Hagan's mother identified one ring as her son's and the bracelet as her grandson's.

### c. Drive-by Shootings

#### i. Bunlort Bun

On August 6, 1995, defendant and other TRG members decided to drive around San Bernardino looking for members of the Oriental Boys, a rival street gang. Defendant gave Evans a gun and followed two men in a red Toyota. The driver, later identified as Bunlort Bun, let the passenger out and sped away. Defendant gave chase while Pan and Evans took turns shooting at the car until it swerved to a stop. Defendant pulled up next to the car. Seeing Bun slumped over, he told Pan and Evans to make sure he was dead. They said they were out of bullets, so defendant handed Pan another ammunition clip. Pan shot Bun three times.

Afterward, either defendant or Pan told Karol that they had seen "Bones," an Oriental Boy gang member who had previously shot 25 rounds at the home of Pan's mother. Defendant said they followed Bones and shot him. At defendant's urging, Karol and others visited the murder scene. When they reported back that there were many police cars there, defendant cheered and joked that they had "drained a whole magazine" into the victim. The 32 cartridge cases found at the scene had been fired from the same two guns used in the Elm Street and Sacramento shootings.

The passenger who had been in Bun's car testified that he was a member of the Oriental Boys gang, but Bun was not. A different member of the Oriental Boys was known as "Bones." Bun was shot five times, with three fatal wounds to the chest and abdomen. The downward trajectory of the bullets was consistent with shots fired into a slumped-over body.

### ii. *Miguel Avina Vargas*

On August 8, 1995, two days after Bun's shooting and the day before the Elm Street murders, defendant was driving in Pomona. Pan rode in front, with Sar and Diep Tran (also called "Giggles") in the back. When they saw a man in a white pickup truck, defendant made a U-turn, drove at the truck, and pulled a gun. Pan told the women to duck. Defendant and/or Pan fired several shots at the truck until it hit a curb and stopped. Sar later told Karol, "Oh, man, we just shot up a Mexican for throwing up [a] sign."

The truck's driver left the scene. The passenger, Miguel Avina Vargas, died of massive internal bleeding from a bullet to the heart. Ten cartridge casings were recovered from the area. All had been fired from one of the guns used in the Elm Street, Sacramento, and Bun shootings.

### d. *In-custody Behavior*

In May 1996, defendant became angry with a jail deputy who denied him "tier time" outside his cell after lights out. He kicked his cell door and yelled for several minutes, threatening to kill the deputy and his family. The conflict continued into the night. When deputies entered his cell in the morning, they found defendant armed with a six-inch stainless steel shank. Defendant then refused to leave his cell for court. He poured shampoo and toilet water onto the cell floor, urging the deputies

13

to come and get him. He was forcibly removed in a violent altercation. A second shank was found hidden in the cell, along with a piece of braided cord that could be used as a garrote.

In December 1998, shortly before defendant's trial was to begin, he was overheard on a phone call discussing a Karol or Carolyn. He said this person had been in protective custody but might be out and he needed to locate her. He said he had men looking for her because "without her, they didn't have a case" against him.

### 2. *Mitigating Evidence*

Defendant presented extensive evidence about his early childhood in Cambodia under the Khmer Rouge regime, atrocities the Khmer Rouge committed against his family and others, and expert testimony explaining how these traumatic experiences may have affected his psychological and neurological development. Because defendant raises no legal issue concerning this evidence, we summarize it only briefly here.

### a. *Childhood Trauma*

Defendant was born in Cambodia in 1972, shortly before the Khmer Rouge took over the country. His father, previously a rice farmer, was drafted and fought against the regime. When their village was attacked, the family hid for more than a week under a Buddhist temple. The Khmer Rouge took over the town, imprisoned his father, loaded defendant and his brother into a wagon at gunpoint, and sent them to a work camp. Defendant was four or five years old and his brother was seven or eight. Children in the camp were indoctrinated to reject their parents and consider the state their family. They had no bed or blankets and were fed only rice water. Many died. Defendant and his

brother ran away at least twice but were caught and brutally punished upon their return. They were freed only after the Vietnamese ousted the Khmer Rouge.

The family was reunited and decided to leave Cambodia, walking for three days and two nights to the Thailand border. They passed many corpses and saw an entire family killed by an exploding landmine. In a Thai refugee camp, defendant often ran away to hunt or beg for more food. He showed signs of starvation and tuberculosis.

The family immigrated to America in 1981, settling in Mobile, Alabama. Defendant went to a school that was not equipped to handle Cambodian refugees and offered no language support. Defendant suffered from poor health and often ran away from home, sleeping in a dumpster. After four years, the family moved to California.

### b. *Psychological and Neurological Evidence*

Trauma expert William Foreman interviewed defendant and his family and reviewed school, court, and medical records. He did not administer psychological tests because he believed defendant lacked the necessary English and reading comprehension skills. Foreman reviewed the history of defendant's early life in detail. The most important thread was his parents' inability to intervene and protect him. For example, defendant nearly drowned when he was very young and was pulled from the water by a villager. Although he was confused and ill afterward, the Khmer Rouge prevented his mother from comforting him. Throughout his childhood, defendant's actions were focused on survival, something typically seen in trauma cases. In the United States, defendant again lacked parental care and supervision. His parents drank heavily, argued

violently, and beat the children. Foreman diagnosed defendant with reactive attachment disorder and chronic posttraumatic stress disorder (PTSD). Antisocial personality disorder was another possible diagnosis based on defendant's "sheer degree of criminal behavior." However, Foreman considered these behaviors artifacts of survival strategies developed in Cambodia. Defendant said he regretted murdering the Nguyen children but had been unable to react emotionally until long after the event. Foreman concluded defendant's criminal and gang activities were reenactments of his early childhood experiences.

Paul Leung, an expert in cross-cultural psychiatry, reviewed the details of defendant's early life and explained that even incidents defendant did not remember could have significantly affected him. Malnutrition could have delayed his brain development and impaired his learning ability. Exposure to war and violence could have caused long-term anxiety. There were also indications of serious head trauma, which could have altered his temperament. Although defendant satisfied several of the criteria, ultimately Leung could not diagnose PTSD because defendant was unable to recall specific traumatic events. Nevertheless, his history and behavior were consistent with PTSD.

Child psychiatrist William Sack also testified about the impact of defendant's early childhood. The forced separation from his parents prevented him from forming a strong family attachment. He would have felt abandoned and survived by self-reliance. The coping strategies he had learned in Cambodia worked against him in the United States. The lack of support from school and family further impaired his development. He found acceptance and trusted friends when he joined a gang.

Sack had participated in a large study assessing PTSD in Cambodian refugees. He discussed defendant's various symptoms and the traumatic experiences that could have induced them. Sack concluded defendant might qualify for a PTSD diagnosis only "if you bend the rules a little bit," because defendant did not report the type of recurrent intrusive thoughts about trauma that are typically seen. Instead, Sack thought reactive attachment disorder was the best diagnosis. Defendant also reported significant substance abuse and chronic depression.

A scan of defendant's brain showed decreased frontal lobe functioning, which is frequently seen in traumatic brain injuries. Portions of his brain were asymmetrical, a pattern also reported in PTSD patients. Defendant displayed abnormally high activity in the orbital frontal lobe, a finding associated with both traumatic brain injury and PTSD. Defendant's brain abnormalities could have been caused by head injury or malnutrition. These patterns have been associated with poor judgment and aggressive impulse control.

### c. Anticipated Custody Conditions and Family Testimony

A former correctional counselor described the conditions in secure housing units at Pelican Bay State Prison. If given a sentence of life without parole, defendant's offenses and jail record would require him to be placed in a Level 4 prison, like Pelican Bay. He would spend at least four to six years in the highly restrictive setting of the prison's secure housing unit.

In addition to describing his childhood, defendant's family members asked the jury to show mercy in sentencing. Onkhamdy testified that defendant had moved with her to

Portland in an effort to quit TRG. He took a job at a deli and spent time fishing and cooking. When he returned to California in June 1995, he said he was going to visit his family. The couple had a son born after defendant's arrest. Although defendant saw the child only once, during a jail visit, he sent the boy birthday cards and letters.

### 3. Rebuttal

During trial, defendant was housed in the county jail's high security unit. Deputies conducting a routine search of his cell found a handmade handcuff key hidden under the frame of his desk. When tested, the key successfully opened a pair of handcuffs.

Craig Rath, a clinical psychologist, disputed the defense experts' findings. Based on defendant's speech in recordings, his high school grades, and the letters he wrote to his girlfriend and others, Rath observed defendant was facile in English. He could have taken many psychological tests that were not given. Rath found the reactive attachment disorder diagnosis questionable because there was ample evidence defendant had formed bonds with his girlfriend and other gang members. This bonding would be impossible for someone with the disorder. Rath thought a conduct disorder was more likely. Defendant's continual criminal behavior was inconsistent with PTSD and more strongly associated with psychopathy or antisocial personality disorder. Defendant's traits and behavior were consistent with severe psychopathy.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Admission of Inflammatory Evidence*

Defendant contends the court improperly admitted irrelevant evidence about the Sacramento murders and his gang membership. Noting the inflammatory quality of the evidence, he contends the errors were so prejudicial as to violate his rights to due process and a reliable guilt verdict. There was no error and no constitutional violation.

##### a. *Other Crimes*

###### i. *Background*

Before trial, the prosecution gave notice that it intended to present guilt phase evidence of several other homicides in the days leading up to the Nguyen murders. Specifically, the prosecution sought to admit evidence of the July 10 home invasion robbery and murders in Spokane; the July 27 murders in Sacramento; the July 28 execution-style murder of Trang Vu (see *post*, at pp. 56–57); the August 6 drive-by murder of Bun; and the August 8 drive-by murder of Vargas. Defendant and Pan each moved to exclude this evidence. The court granted their motions as to most of the crimes, concluding the circumstances were too dissimilar from the present charges for the evidence to be admissible. It held an Evidence Code section 402 hearing to consider admissibility of the Sacramento crimes.

After hearing from several witnesses, the court determined the Sacramento evidence was admissible against Pan on the issue of knowledge and intent in providing the murder weapon. Although the issue was "more troublesome and closer" in defendant's case, the court concluded the evidence

showed premeditation and malice. The Sacramento crimes tended to show defendant entered the Elm Street home with the intent to commit a robbery and, in doing so, "he did not hesitate to kill individuals when he felt it to be necessary." Because the evidence was admissible against both defendant and Pan, the court also denied a severance motion. After the court granted Pan's motion for acquittal (see § 1118.1), defendant renewed his objections and moved for a mistrial. The court denied the motion, noting that defendant's conduct in Sacramento tended to show his premeditation and intent to kill in the Elm Street murders. Similarities between the crimes also tended to establish they were done as part of a common scheme.

During trial, the court instructed extensively on the limited ways the jury could use the Sacramento evidence. Three times, before testimony concerning the Sacramento case, the court read the following admonition:

"Certain evidence is admitted for a limited purpose. Such evidence is going to be received at this time. [¶] You are instructed that you are not to consider it for any purpose other than the limited purpose for which it is admitted. The fact that it is being admitted at this point in the trial has no significance as to its relative importance.

"This trial concerns charges by the [P]eople that the defendants allegedly committed a home-invasion robbery/murder which occurred on August 9, 1995, on Elm Street in the City of San Bernardino. [¶] I remind you that the defendants have entered pleas of not guilty and it will be up to the jury to determine whether or not they are guilty of the charges which the People must prove to you beyond a reasonable doubt.

"The law permits under certain circumstances that evidence of similar crimes or criminal acts to those charged in this case may be presented to the jury. This evidence concerns an uncharged crime in this trial that occurred in the [C]ity of Sacramento on July 27, 1995. That crime involved a home-invasion robbery/murder. [¶] This evidence is being admitted for the limited purpose as evidence in the Elm Street crimes of premeditation and malice aforethought as required in the crime of first degree murder, [and] the necessary intent as required in the crimes of murder, robbery, and burglary. It may be used as evidence of a common scheme, motive, or knowledge. You will be completely instructed as to the elements of all crimes charged in the Elm Street incident.

"Before you may consider this evidence for any purpose, you must be satisfied by a preponderance of the evidence that the Sacramento crimes took place and that the defendants were participants in committing them. You are not to consider any of this limited evidence as proof of a propensity of the defendants to commit the crimes charged in the Elm Street offenses and you are reminded you may not find either or both of the defendants guilty of the Elm Street crimes solely on this evidence, but must determine the truth of those charges beyond a reasonable doubt. And you may consider this evidence of the Sacramento crimes only for the limited purpose for which it is being admitted. [¶] Further, you may not and you are not to consider this evidence of the Sacramento offenses as corroboration of the testimony of any coparticipant that may testify in this trial concerning the Elm Street killings."

A slightly modified version of this admonition, referring to a singular defendant instead of "defendants," was also included in instructions before closing argument. At that time, the court

21

gave further instructions on the limited purposes for which the Sacramento evidence could be considered:

"Evidence has been introduced for the purpose of showing that the defendant committed a crime other than that for which he is on trial. [¶] This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining that it tends to show a characteristic method, plan, or scheme in the commission of criminal acts similar to the method, plan, or scheme used in the commission of the offenses in this case[,] which would further tend to show . . . [¶] [t]he existence of the intent which is a necessary element of the crime charged; [¶] [or, a] motive for the commission of the crime charged[.] [¶] For the limited purpose for which you may consider such evidence, you must weight it in the same manner as you do all other evidence in this case." (See CALJIC No. 2.50.)

## ii. Discussion

Defendant first argues the Sacramento evidence was improperly admitted under Evidence Code sections 1101 and 352. Evidence Code section 1101, subdivision (a) prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. The provision "expressly prohibits the use of an uncharged offense if the only theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense." (*People v. Thompson* (1980) 27 Cal.3d 303, 316.)

"Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) "If an uncharged act is relevant to prove some fact other than propensity," such as the perpetrator's intent or identity, or the existence of a common plan, "the evidence is admissible, subject to a limiting instruction upon request." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 406 (*Bryant, Smith and Wheeler*).)

"Evidence of uncharged crimes is admissible to prove identity, common plan, and intent 'only if the charged and uncharged crimes are sufficiently similar to support a rational inference' on these issues." (*People v. Edwards* (2013) 57 Cal.4th 658, 711 (*Edwards*).) The degree of similarity varies depending on the purpose for which the evidence is offered. "The least degree of similarity . . . is required in order to prove intent." (*Ewoldt, supra,* 7 Cal.4th at p. 402.) For this purpose, "the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Ibid.*) A higher degree of similarity is required to prove the existence of a common plan: "[E]vidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*Ibid.*) Finally, although not at issue here,[9]

---

[9] The court specifically ruled the Sacramento evidence was not admissible to prove identity. There was ample other evidence that defendant was among the attackers in both Sacramento and San Bernardino. The court also instructed that

"[t]he greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity." (*Ewoldt*, at p. 403.) To establish identity, the uncharged and charged crimes " 'must be so unusual and distinctive as to be like a signature.' " (*Ibid.*)

Even if evidence of the uncharged conduct is sufficiently similar to the charged crimes to be relevant for a nonpropensity purpose, the trial court must next determine whether the evidence's probative value is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; see *Ewoldt*, *supra*, 7 Cal.4th at p. 404.)

As with other evidentiary rulings, the trial court's decision is reviewed for abuse of discretion. (*Edwards*, *supra*, 57 Cal.4th at p. 711.) " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329 (*Foster*).) We conclude evidence of the Sacramento crimes was properly admitted to

---

before jurors could even consider the Sacramento evidence as to common plan or scheme or state of mind, they had to find by preponderating evidence that defendant had participated in both attacks. Naturally, as with all circumstantial evidence, the jury could not rely on the Sacramento evidence as proof of guilt unless it concluded those relevant facts had been proven beyond a reasonable doubt. The jury was given CALJIC Nos. 2.01 and 2.02, which properly explained the use of circumstantial evidence.

show defendant's state of mind for the charged offenses. Because the court did not abuse its discretion under state law, defendant's constitutional claims also fail. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670.)

As the trial court observed, the Sacramento murders shared numerous common features with the Elm Street attacks committed less than two weeks later. Both sets of murders occurred in the evening during home invasion robberies. Both were carried out as gang-related activities. The targets were Asian[10] families, known to someone associated with the gang, and believed to keep cash or jewelry in the home. In both cases, the person who had provided information on the family waited in the car while other gang members entered the home. Defendant took two associates inside with him each time: Pan and Evans in Sacramento; Evans and Scrappy in San Bernardino. Defendant was armed with a Glock nine-millimeter pistol in each robbery. The incidents unfolded similarly, as well. In each, the robbers inflicted a nonfatal wound on one family member while demanding that the others produce money and valuables. When the victims did not comply, they were shot repeatedly.

There were some differences between the incidents. The Sacramento crime occurred in an apartment rather than a house. It was witnessed by other family members from an upstairs apartment. Defendant was identified as the only robber armed with a handgun. He left two family members alive in Sacramento and obtained no money but left only one survivor at Elm Street and acquired cash and jewelry. These differences

---

[10] Both were apparently Vietnamese, although Quyen Luu of the Le family used a Cantonese interpreter in testifying.

do not undermine the probative value of the crimes' many similarities. If anything, they reveal that defendant and his fellow gang members learned from their recent mistakes and carried out the Elm Street crimes more effectively. The botched Sacramento crime could explain defendant's desire to have a second gun available at Elm Street. Defendant also complains that the similarities the court found could describe most residential robberies. However, "it was the *combination of similar factors* common to" both crimes that rendered them distinctive and made the Sacramento evidence relevant for a nonpropensity purpose. (*People v. Rogers* (2013) 57 Cal.4th 296, 328 (*Rogers*).) In an Evidence Code section 1101, subdivision (b) analysis, " 'features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' " (*Rogers*, at p. 328.)

" ' "We have long recognized 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance' . . . . The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution." ' " (*People v. Roldan* (2005) 35 Cal.4th 646, 706 (*Roldan*).) The Sacramento and Elm Street crimes were sufficiently similar to show the same intent in both cases: to kill any or all residents if necessary to successfully complete the robbery. For the same reason, as the trial court observed, the Sacramento evidence tended to show that the Elm Street murders were premeditated and deliberate, rather than the result of an impulsive or spontaneous reaction. We have frequently upheld the admission of uncharged crime evidence relevant to premeditation, deliberation, and intent to kill. (See,

e.g., *Rogers*, *supra*, 57 Cal.4th at p. 328; *People v. Soper* (2009) 45 Cal.4th 759, 778 (*Soper*).)  Similar evidence was also held properly admitted to show intent and common design or plan in *People v. Johnson* (2013) 221 Cal.App.4th 623.  In *Johnson*, "Both crimes were home-invasion robberies.  The main purpose of the crimes was to obtain drugs.  The modus operandi used to gain admission into the residences was the same: knocking on the front door and forcing entry when the victim opened the door.  In both crimes, appellant was assisted by two accomplices and was the 'mastermind.' " (*Id*. at p. 635.)  Similarly here, the trial court did not abuse its discretion in admitting the Sacramento crimes to show defendant's state of mind.

As in *Johnson*, the evidence was also relevant to whether defendant acted in accordance with a common design or plan. "Evidence of a common design or plan . . . is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (*Ewoldt*, *supra*, 7 Cal.4th at p. 394.)  Here, in addition to asserting premeditation and deliberation, the prosecution pursued first degree murder charges under a felony-murder theory.  It had to prove not only that members of the Nguyen family were murdered, but also that the murders were committed in the course of a robbery or burglary.  Evidence of defendant's conduct 13 days earlier was relevant to show he employed the same general plan on both occasions.  Armed with a nine-millimeter pistol, defendant and two fellow gang members entered the homes of specifically targeted Asian families, demanded cash and jewelry, disabled one family member with a nonfatal shot, then killed some or all of the

victims.[11] " 'To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual'; rather it 'need only exist to support the inference that the defendant employed that plan in committing the charged offense.' " (*Edwards*, *supra*, 57 Cal.4th at p. 712.) Accordingly, once the evidence was admitted to show defendant's state of mind, the court could also properly instruct on its relevance to show a common plan.[12]

Defendant protests the Sacramento evidence was not relevant to any *disputed* issue. He argues intent to kill was clear from the manner of the killings, with the victims shot at very close range, and that premeditation should not be considered a disputed issue because in closing argument the prosecutor invited the jury to rely on felony murder as an "easier" path to a first degree murder conviction. Finally, he maintains that no one disputed a robbery and burglary had taken place at Elm Street. The only real dispute, according to defendant, was his identity as one of the Elm Street attackers. These arguments misapprehend the prosecution's burden at trial. As we have repeatedly noted, a not guilty plea places in issue all elements of the charged crimes. (See, e.g., *Bryant, Smith and Wheeler*,

---

[11] Quyen Luu's testimony suggests Hung Le's brother and possibly one other person were in the Sacramento apartment during the robbery, but it does not appear these individuals were shot.

[12] Separately, defendant asserts that the Sacramento evidence was admissible only against Pan, and the court erred in refusing to sever his trial from Pan's. Because we have concluded the evidence was relevant to disputed issues in the charges against *defendant*, however, the premise of this argument fails.

*supra*, 60 Cal.4th at p. 407; *People v. Lindberg* (2008) 45 Cal.4th 1, 23 (*Lindberg*); *Roldan, supra*, 35 Cal.4th at pp. 705–706.) Defendant did not concede his guilt on any issue, requiring the prosecution to prove each element of first degree murder, attempted murder, robbery, and burglary, along with the enhancements and special circumstances. "Defendant's assertion that his defense to the . . . charges was bound to focus upon identity, and not intent, would not eliminate the prosecution's burden to establish both intent and identity beyond a reasonable doubt." (*Soper, supra*, 45 Cal.4th at p. 777.) Even when other evidence is present, it remains the prosecution's burden to prove premeditation and malice beyond a reasonable doubt. It has the "right to introduce all relevant and admissible evidence toward that end." (*Rogers, supra*, 57 Cal.4th at p. 330.)[13]

The court also properly exercised its discretion under Evidence Code section 352. (See *Ewoldt, supra*, 7 Cal.4th at p. 404.) The Sacramento and Elm Street murders shared numerous similarities. Defendant committed them less than two weeks apart. The Sacramento evidence was highly probative of defendant's mental state in San Bernardino. (See *Rogers, supra*, 57 Cal.4th at p. 331.) Nor was the evidence unduly prejudicial. "As we have repeatedly explained: ' "In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' [Citation.] ' " '[A]ll evidence which tends to prove

---

[13] Defendant's argument is also at odds with his trial strategy. His lawyer gave no opening statement and offered no guilt-phase evidence. His defense only became fully clear during closing arguments, when counsel asserted there was insufficient corroboration of the accomplices' testimony to support a finding of guilt beyond a reasonable doubt.

guilt is prejudicial or damaging to the defendant's case.' " ' [Citation.] The 'prejudice' which section 352 seeks to avoid is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 275.) The Sacramento crimes were less inflammatory than the charged crimes, in that fewer people were killed and none were children. Defendant complains that the volume of testimony about the Sacramento crimes was disproportionate to its relevance. He argues the evidence was merely cumulative because the nature of the Elm Street shootings showed the perpetrator's intent and the jury did not need to find premeditation to convict on first degree murder. But, as noted, the issues of defendant's intent and actions were not beyond dispute, and additional evidence on these subjects was not merely cumulative. (See *People v. Scott* (2015) 61 Cal.4th 363, 399; *Foster*, *supra*, 50 Cal.4th at p. 1331.)

Moreover, the extensive limiting instructions the court read during testimony and before argument directed the jury not to use the other crimes evidence for an improper purpose, including bad character. "We presume the jury followed these instructions." (*Lindberg*, *supra*, 45 Cal.4th at p. 26.) The prosecutor's closing argument reinforced the instructions. He explained at length that the Sacramento evidence was only offered to show that defendant acted according to a common scheme and with the intent to kill, and could not be used simply to show that defendant was a bad person.

### b   *Gang Membership*

Defendant complains of evidence he belonged to a gang. The evidence violated neither statutory nor constitutional law.

*i. Background*

Defendant and Pan both moved to exclude evidence of gang membership. The court denied the motion in a written order, explaining: "This uncharged conspiracy, if proven, would tend to establish Pan's involvement in the crime, showing his knowledge and intent in furnishing the gun, and it would be of some value to the prosecution in establishing the necessary specific intent by both defendants to commit the robbery and burglary which resulted in the murders and which then may tend to prove motive." The court cautioned that the gang evidence should be limited to that needed to explain the relationship between the defendants, Pan's conduct, and both men's intent and motive. It concluded the evidence would not be unduly prejudicial under Evidence Code section 352 because, even without direct evidence, the facts of the case "allude to and strongly suggest the existence of a gang" and defendants' relationship to it.

After an in limine hearing, the court allowed Sergeant Frank to testify as an expert about the organization of Asian gangs, including the Tiny Rascals, as well as their differences from other types of gangs, their use of firearms, and their typical practice of committing home invasion robberies. The prosecutor was not permitted to ask hypotheticals that would elicit an opinion about the Sacramento or Elm Street crimes. Nor could he present evidence about Asian gangs' attempts to intimidate witnesses, unless it later became relevant to explain a witness's attitude or conduct.

Before Sergeant Frank testified, the court gave an admonition agreed upon by the parties: "This witness . . . is being called for a specific purpose and a very limited purpose.

The law allows that some evidence occasionally may be admitted for limited purposes only, and you will be admonished to consider this evidence only for those limited purposes. This is such evidence. You're going to hear testimony concerning activities which at first may sound strange to you and not relevant to the case, but at some subsequent time I will admonish you and explain to you why the evidence is relevant, if it is, and why it has been admitted and the limited purpose for which you may consider it." Before closing arguments, the jury was instructed: "Evidence has . . . been introduced that the defendants are members of the Tiny Rascals Gang. Such evidence, if believed, was not received and may not be considered by you to prove that they are persons of bad character or that they have a disposition to commit crimes."

## ii. Discussion

The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655 (*McKinnon*).) "Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) Even when it is relevant, however, "courts should carefully scrutinize evidence of a defendant's gang membership because such evidence 'creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged.'" (*People v. Melendez* (2016) 2 Cal.5th 1, 28–29; see *People v. Williams* (1997) 16 Cal.4th 153, 193.) We review the

trial court's ruling for abuse of discretion. (*Melendez*, at p. 29; *People v. Carter* (2003) 30 Cal.4th 1166, 1194 (*Carter*).)

Defendant first complains his gang affiliation was not relevant to any disputed issue. As with the Sacramento evidence, he contends his intent to kill was indisputable given the manner of the shootings. He also argues, "The motive for the crime here, financial gain, was apparent — and not gang related." However, these characterizations adopt an overly narrow view of the disputed issues and the evidence relevant to address them.

As noted, a not guilty plea disputes all elements of the charged crimes. (See *Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 407; *Lindberg*, *supra*, 45 Cal.4th at p. 23; *Roldan*, *supra*, 35 Cal.4th at pp. 705–706.) Evidence of defendant's gang membership was relevant to show his relationship with the accomplices who testified against him, to prove his identity as one of the robbers. (See *People v. Montes* (2014) 58 Cal.4th 809, 859 (*Montes*).) It also tended to show his intent to steal and kill if necessary. Sergeant Frank's testimony helped illuminate other evidence about the plan or scheme by which the crimes were carried out. Frank explained that home invasion robberies are a signature crime of Asian street gangs like TRG and are typically committed against Asian families, such as the Nguyens. The gangs frequently intimidate their victims by threatening, harming, or even torturing the most vulnerable family members, including children. This evidence helped explain the significance of the nonfatal gunshot wound to Dennis's hand, the small knifepoint cuts to Henry's neck, and the toothpaste smeared on Trinh's face. Because home invasion robberies are complex crimes, gangs often assign specific roles to different gang members. Frank also explained that Asian

gangs particularly value firearms and use them only for committing crimes. This testimony shed light on how the robbery was conducted, including why only two guns were taken to the house and why so many bullets had been fired from a single weapon.

In addition, the evidence showed defendant was a shot caller in TRG, which meant he had enough standing in the gang to give direction to junior members. This evidence, combined with Frank's testimony that Asian gangs promote leaders based on their criminal experience, was relevant to defendant's motive to rob and his intent to kill while doing so. Defendant's argument that financial gain was the sole motive for the robbery ignores evidence that committing the crimes would have enhanced his gang status. Moreover, defendant's sole focus on the robbery is too narrow. Intent to kill was a disputed issue for the murder charges and special circumstances. While not itself an element of the crimes, motive can illuminate intent. (See, e.g., *Carter*, *supra*, 30 Cal.4th at p. 1195.) " ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*McKinnon*, *supra*, 52 Cal.4th at p. 655.)

Defendant next argues that even if evidence of his gang membership was relevant, the gang expert's testimony should have been excluded because it was overbroad, inflammatory, and unduly prejudicial. He complains that the testimony pertained to Asian gangs generally, rather than TRG in particular. But Frank testified in detail about TRG's history and organization. He also described the age and gender of members, the meaning of TRG's name, and the significance of TRG tattoos. Defendant was free to highlight any

overgeneralizations on cross-examination and did so at length. During defendant's cross-examination, Frank conceded there are many Asian cultures and some differ markedly. In response to Pan's questioning, Frank also explained that, while many Asian gangs are no longer ethnically separated, gangs of different ethnicities can have distinct structures. For example, age determines leadership in Korean gangs, whereas experience is more important in Vietnamese and Cambodian gangs.

Defendant's primary objection, however, concerns expert testimony about victim intimidation. Frank testified that Asian street gang members had "universally" told him their primary compliance tactic was "to go after the children in front of their parents." He explained, the "younger the child . . . , the more coercive they feel that can be with the parents. And so it's not at all uncommon to start with either the very youngest or the very oldest member of the household." Frank described three incidents: "We've had a two-year-old hung . . . by his ankles out of a second story window"; "another case where a one-year-old child was picked up and his head repeatedly dunked in the toilet"; and a third instance in which "a pan of boiling water . . . was poured over a 79-year-old grandmother." Defendant argues these examples were irrelevant and needlessly inflammatory. However, this testimony was relevant to explain the nonfatal wounds on the Elm Street victims, as well as the nonfatal gunshot wound inflicted upon Quyen Luu in Sacramento. It illuminated the gang's modus operandi and explained the motive for the nonfatal gunshots, knife cuts, and toothpaste smeared on Trinh Tran's face. Although distressing, the examples directly showed the perpetrators' desire to *cause* distress in pursuit of their aims. Testimony about them was

brief and unelaborated and was not more inflammatory than the torture and murders of the Nguyen family.

Nor was the probative value of the gang evidence substantially outweighed by the risk of undue prejudice. " 'The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.' " (*Montes*, *supra*, 58 Cal.4th at p. 859.) The court here carefully weighed the probative value of the evidence against the potential for undue prejudice. It took steps to minimize the subject areas of expert testimony and instructed that the evidence could not be used as proof of defendant's character.

Defendant complains the limiting instructions were inadequate because the court never explained what purpose the gang evidence *could* be used for, even though its first admonishment said an explanation would later be provided. If defendant believed a more extensive instruction was needed, it was his burden to request one. (See *People v. Powell* (2018) 6 Cal.5th 136, 161; *Hernandez*, *supra*, 33 Cal.4th at p. 1052.) During trial, the court invited counsel to propose instructions on the issue. Indeed, the record suggests that the closing instruction on gang evidence was offered by the *defense*.[14] It described the prohibited uses of the evidence but refrained, possibly for tactical reasons (see *Hernandez*, at p. 1053), from

---

[14] The court stated: "Special instructions have been offered by the defense, and one is . . . instruction number 2.50a regarding the fact that evidence has been offered concerning the fact that the defendants are members of the Tiny Rascal[s] Gang, and this should not be used as any consideration by the jury that they're bad persons or of bad character or that they have a disposition to commit crime[s]."

spelling out exactly how the evidence could be used. Having proposed the instruction at issue, and raised no objection, defendant cannot now complain it was inadequate. His reliance on *U.S. v. Jobson* (6th Cir. 1996) 102 F.3d 214 is also unavailing. Jobson requested a limiting instruction on gang evidence but the district court declined to give it, instructing the jury instead that the evidence had been admitted for a limited purpose without ever saying what the purpose was or that using the evidence as proof of bad character or a criminal disposition was prohibited. (*Id.* at p. 222.) The case is not precedentially binding on this court and is factually distinguishable.[15]

### 2. *Witness Support Persons*

Witness support persons were present in court during some testimony. Defendant complains that the court failed to follow required statutory procedures and that this practice violated his confrontation and due process rights. There was no prejudicial error.

### a. *Background*

An employee of the District Attorney's office accompanied Lilah Garcia to the witness stand.[16] Garcia was a neighbor who found the Nguyens' bodies and comforted Dennis. When defendant objected in chambers, the prosecutor made an offer of proof that Garcia was "terrified to be here," "very afraid of these defendants," and had asked that a support person sit with her.

---

[15] Although no error occurred here, an instruction explaining the limited purpose for which gang evidence has been admitted, such as CALCRIM No. 1403, is generally advisable.

[16] The same support person had previously joined Mei Le and Amie Le during their testimony at an Evidence Code section 402 hearing.

Defendant's attorney requested a hearing on whether the support person was requested and necessary. The court accepted the prosecutor's offer and found that the need for a support person had been adequately established. The employee was placed in a seat "substantially behind the witness" and ordered to remove a badge showing her association with the District Attorney's office. The court stated that the jury would be given "no indication as to who she is, why she's there or anything else, other than she's just simply there." The next day, defense counsel observed that, in addition to accompanying Garcia at the witness stand, the person also sat in the front row of the audience section during testimony from another witness.[17] He asked that the court admonish any future support persons not to prompt or interfere with the testifying witness. (See § 868.5, subd. (b).)

Later in trial, the prosecutor advised the court and counsel that Mei Le and Amie Le, the daughters of the Sacramento victims, requested a support person during their testimony. This time defense counsel requested an admonition not to the support person but to the jury, explaining "that she is an employee of the D.A.'s office and a witness advocate." The court stated it would "simply tell the jury that . . . the witness[] has requested that there be a person in the courtroom pending her testimony to act as liaison support and that this individual is in that capacity." Defense counsel responded, "Uh-huh," which was apparently understood as assent. When Mei was called the following day, the court stated: "Ladies and gentlemen, you will

---

[17]    Although counsel did not name the witness, his description of her as a Hispanic woman suggests it was Graciela Elias, another neighbor who testified immediately after Garcia.

notice that there is a young lady sitting behind the witness. [¶] The law allows that a witness under certain circumstances can request the presence of someone to merely be there for moral support. That individual is not to in any way confer with, attempt to influence, or be involved at all in the testimony. Just the mere presence is allowed and for the assurance that the witness may have by that individual being here. So please understand that is why this other person is seated behind the witness." The admonition was not repeated before Amie's testimony.

Finally, defendant's counsel objected to the presence of a support person during Karol Tran's testimony. Shirley Amador, the wife of Karol's attorney Robert Amador, sat inside the railing behind the District Attorney's table. Counsel argued Shirley was a potential witness because she had helped secure a reduction in the charges against Karol. The prosecutor disputed this characterization, noting Shirley was not on his witness list and the defendants had indicated they would not call any witnesses. He observed that Karol had a right to have her attorney present but he was in trial elsewhere. In his place, Shirley was there "just to be moral support" for Karol. He stressed that she was sitting "out in the audience" and not at the witness stand. The court overruled the objection.

During Karol's cross-examination, defendant's attorney interjected to complain that Shirley was signaling or coaching the witness. Pan's attorney called for a recess, and both defense attorneys conferred with Robert Amador, who had entered the courtroom at some point during the testimony. Pan's attorney then explained that Karol "wasn't talking to Shirley. She was motioning to Mr. Amador," her attorney. One of defendant's attorneys stated he had seen Shirley's lips moving while looking

at the preliminary hearing transcript, which at the time was being used to impeach Karol, but "we all believe it was inadvertent." Defendant's other attorney added, "And it appears in this last exchange that she was not conversing with the witness. The witness was attempting to converse with her and she was warning her off." The prosecutor suggested it would be better to have Shirley sit elsewhere, but the record does not indicate whether that happened.

### b. *Discussion*

Under section 868.5, subdivision (a), prosecuting witnesses in a murder case are entitled to the attendance of up to two support persons during their preliminary hearing and trial testimony. One person may also accompany the witness at the witness stand. (§ 868.5, subd. (a).) Section 868.5, subdivision (b) requires additional procedures in some circumstances. If the support person is also to be called as a witness, the prosecution must present evidence that the support person's attendance is desired and will be helpful to the prosecuting witness. (§ 868.5, subd. (b).) The judge must also "admonish the support person or persons to not prompt, sway, or influence the witness in any way." (*Ibid.*)

Defendant contends the court did not follow these required procedures because it failed to conduct an evidence-based "need assessment" or "give the required admonition" each time a support person appeared. The first argument lacks support in the statute. On its face, section 868.5, subdivision (b) requires an assessment of need only when the chosen support person is also to be a witness in the case. That circumstance was not present here. The second argument presents a closer question. Although the subdivision is prefaced with the phrase "[i]f the

person or persons so chosen are also witnesses," which would seem to limit its application to this specific context, a later sentence addressing admonitions provides that "[i]n all cases, the judge shall admonish the support person or persons to not prompt, sway, or influence the witness in any way."[18]  (§ 868.5, subd. (b).)  It is unclear whether the admonition requirement is intended to apply in all cases or in all cases involving a support person who will also be a witness, and the Courts of Appeal have reached different conclusions.  (Compare *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1169–1171 (*Valenti*) with *People v. Spence* (2012) 212 Cal.App.4th 478, 513 (*Spence*).)  We need not decide this question because there is no evidence that a support person prompted, swayed, or influenced the witnesses in any way.  Accordingly, any error in failing to admonish the

---

[18]  The full text of the subdivision states:  "*If the person or persons so chosen are also witnesses*, the prosecution shall present evidence that the person's attendance is both desired by the prosecuting witness for support and will be helpful to the prosecuting witness.  Upon that showing, the court shall grant the request unless information presented by the defendant or noticed by the court establishes that the support person's attendance during the testimony of the prosecuting witness would pose a substantial risk of influencing or affecting the content of that testimony.  In the case of a juvenile court proceeding, the judge shall inform the support person or persons that juvenile court proceedings are confidential and may not be discussed with anyone not in attendance at the proceedings.  *In all cases*, the judge shall admonish the support person or persons to not prompt, sway, or influence the witness in any way.  Nothing in this section shall preclude a court from exercising its discretion to remove a person from the courtroom whom it believes is prompting, swaying, or influencing the witness."  (Pen. Code, § 868.5, subd. (b), italics added.)

support persons was harmless. (See *People v. Watson* (1956) 46 Cal.2d 818, 837.)

Despite the lack of statutory support, defendant argues a case-specific, evidence-based showing of need for support persons is required under the federal Constitution. He asserts the procedure here infringed his Sixth Amendment confrontation rights and was not justified by a compelling state interest, given that the witnesses were not children or sexual abuse victims who would be particularly susceptible to psychological harm. Case law is to the contrary. (See *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1077; *People v. Adams* (1993) 19 Cal.App.4th 412, 435–437 (*Adams*).) Concerns about improper vouching are also unfounded because the mere " 'presence of a second person at the stand does not require the jury to infer that the support person believes and endorses the witness's testimony, so it does not *necessarily* bolster the witness's testimony.' " (*People v. Stevens* (2009) 47 Cal.4th 625, 641, quoting *Adams*, at p. 437.) "Absent improper interference by the support person, . . . no decision supports the proposition that defendant advances here, that the support person's mere presence infringes his due process and confrontation clause rights." (*People v. Myles* (2012) 53 Cal.4th 1181, 1214 (*Myles*); see *Valenti, supra*, 243 Cal.App.4th at p. 1171; *Spence, supra*, 212 Cal.App.4th at p. 514.)

Defendant contends a different result is compelled by *Maryland v. Craig* (1990) 497 U.S. 836 (*Craig*) and *Coy v. Iowa* (1988) 487 U.S. 1012, but the procedures employed in those cases placed significant burdens on confrontation that were not present here. In *Coy*, a large screen was placed between the defendant and the witness stand, blocking the defendant's view. (*Coy*, at pp. 1014–1015.) Because this tactic prevented a face-

to-face encounter, it violated the confrontation clause. (*Id.* at pp. 1016–1020.) In *Craig*, a child witness was allowed to testify by one-way closed-circuit television. (*Craig*, at p. 840.) The court held the confrontation clause does not categorically prohibit such a procedure, and a witness may testify outside the defendant's presence if the alternative arrangement is justified by a compelling state interest and a case-specific finding of need. (*Id.* at pp. 849, 852, 855–856.) These holdings concerned procedures that deny face-to-face confrontation with an accuser, a core concern of the confrontation clause. The use of a support person does not do so. We agree with the Courts of Appeal that have concluded the support person procedure does not require the same constitutional scrutiny. (See *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1298 (*Andrade*); *People v. Chenault* (2014) 227 Cal.App.4th 1503, 1516 (*Chenault*); *People v. Johns* (1997) 56 Cal.App.4th 550, 554 (*Johns*); *People v. Lord* (1994) 30 Cal.App.4th 1718, 1722 (*Lord*); *People v. Patten* (1992) 9 Cal.App.4th 1718, 1727.)

Nevertheless, relying on *Adams*, *supra*, 19 Cal.App.4th 412, defendant argues his confrontation rights were infringed because the presence of witness support persons interfered with the jury's observation of testifying witnesses' demeanor. In *Craig*, the high court described four key components of the confrontation right: "(1) the face-to-face confrontation, (2) the oath, (3) the cross-examination, and (4) the jury's observation of the witness's demeanor." (*Johns*, *supra*, 56 Cal.App.4th at p. 554, citing *Craig*, *supra*, 497 U.S. at p. 846.) The Court of Appeal in *Adams* asserted the use of support persons implicates the fourth component, jury observation of witness demeanor, because a support person's presence changes "the dynamics of the testimonial experience for the witness" and thus alters the

witness's demeanor. (*Adams*, at p. 438.) Notably, the *Adams* comments were made within a peculiar factual context. The defense claimed the victim had falsely reported a sexual assault because she feared the wrath of her abusive father. The father was a trial witness and also appeared as her support person. (*Id.* at pp. 424, 434–435.) This situation posed an unusual risk that the support person's mere presence might exert improper influence on the witness during her testimony. To the extent *Adams* implied a broader holding, requiring a compelling state interest and necessity showing in other contexts, courts have disagreed with it. (See *Andrade*, *supra*, 238 Cal.App.4th at p. 1298; *Chenault*, *supra*, 227 Cal.App.4th at p. 1516; *Johns*, at p. 554; *Lord*, *supra*, 30 Cal.App.4th at pp. 1721–1722; see also *Valenti*, *supra*, 243 Cal.App.4th at pp. 1171–1172; *Spence*, *supra*, 212 Cal.App.4th at pp. 517–518.) We do as well. A support person's mere presence in the courtroom or at the witness stand does not infringe the defendant's due process or confrontation rights unless there is evidence of improper interference by the support person. (*Myles*, *supra*, 53 Cal.4th at p. 1214.)

Aware of our precedent, defendant claims support persons "improperly insinuated themselves into the trial" on two occasions. First, he notes that Garcia's support person stood between Garcia and the jury, blocking the jury's view, and wore a badge that disclosed her employment. Defendant appears to challenge the support person's positioning as a confrontation clause violation and her badge as an instance of prosecutorial vouching in violation of the due process clause. We need not consider these arguments based on the record here. Defense counsel objected immediately after Garcia was seated and gave her name. Following a chambers conference, the court ordered

that the support person be moved to a seat "substantially behind" Garcia to ensure the jury's view would be unimpeded. It also ordered that the support person's employment badge be removed. The badge was not on display when Garcia was testifying. If the badge had been visible when the support person entered the courtroom, this indication of employment was not an invocation of the office's prestige or reputation implicating vouching concerns. (See *People v. Rodriguez* (2020) 9 Cal.5th 474, 480.) Indeed, before Mei Le testified, defendant's attorney asked that the jury be *told* the support person was an employee of the District Attorney's office. Defendant cannot complain of prejudice if a briefly worn badge indicated the information he sought revealed.

Defendant also asserts Karol Tran's support person was inappropriately signaling to the witness during her testimony, but the record belies this assertion. Although defense counsel originally believed Shirley Amador was communicating with Karol, he later clarified that she was not doing so. Instead, "[t]he witness was attempting to converse with *her* and she was warning her off." (Italics added.) Shirley's lips had been moving while she looked at the transcript, but defense counsel assured the court that he considered the movement "inadvertent" and not an attempt to communicate with Karol. Defendant thus abandoned his objections below, and the record fails to demonstrate any improper interference.

Finally, there is no indication of prejudice. At defendant's request, the court admonished the jury that the law entitles witnesses to have someone with them for moral support and that support persons may not interfere with the witness's testimony. (See *Myles*, *supra*, 53 Cal.4th at p. 1215.) Although defendant now complains that the admonition was not repeated each time

a witness used a support person, he did not object on this ground below.  Indeed, for tactical reasons, defense counsel may have wished to avoid drawing attention to the support person's presence by repeated admonitions.  The court also told the jury to decide the case based on the evidence and not be influenced by sentiment or sympathy.  (CALJIC No. 1.00.)  To the extent defendant now claims this instruction was insufficient, it was his burden to propose amended or additional instructions.  He did not do so.

### 3.  *Instructional Error Claims*

Although he raised no objection below, defendant now argues several of the standard guilt phase instructions violated his constitutional rights.  As he recognizes, we have rejected these claims many times before.  We affirm these holdings.

### a.  *First Degree Murder Instructions*

Defendant first argues the court lacked jurisdiction to try him for first degree murder because the information charged murder under section 187, which he contends defines only second degree malice murder.  He claims his convictions for an uncharged crime violated his rights to due process, a jury trial, and a fair and reliable capital guilt trial.  (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15–17.)  "Similar claims — whether framed in terms of a lack of jurisdiction, inadequate notice, erroneous instruction, insufficient proof, or the absence of jury unanimity — have been rejected before. . . . [O]ur cases have long made clear that an accusatory pleading charging malice murder supports conviction of first degree murder," whether on a felony-murder or premeditation theory. (*People v. Contreras* (2013) 58 Cal.4th 123, 147 (*Contreras*); see *People v. Sattiewhite* (2014) 59 Cal.4th 446, 474 (*Sattiewhite*);

*People v. Friend* (2009) 47 Cal.4th 1, 54 (*Friend*).) "Malice murder and felony murder are two forms of the single statutory offense of murder. Thus, a charge of murder not specifying the degree is sufficient to charge murder in any degree. The information also need not specify the theory of murder on which the prosecution relies at trial." (*Contreras*, at p. 147; see *People v. Hughes* (2002) 27 Cal.4th 287, 369–370 (*Hughes*); see also *People v. Witt* (1915) 170 Cal. 104, 107–108.)

Nevertheless, defendant argues these principles were "completely undermined" by *People v. Dillon* (1983) 34 Cal.3d 441, which described section 189 as "a statutory enactment of the first degree felony-murder rule in California." (*Id.* at p. 472.) This argument fails. "Because there is only a single statutory offense of first degree murder [citation], defendant reasons that the relevant statute must be section 189, not section 187, which he construes as a definition of second degree murder. Defendant misreads both *Dillon* and the statutes. *Dillon* made it clear that section 187 serves *both* a degree-fixing function and the function of establishing the offense of first degree felony murder. (*Dillon*, at pp. 468, 471.) It defines second degree murder as well as first degree murder. Section 187 also includes both degrees of murder in a more general formulation. (*People v. Witt*[, *supra*,] 170 Cal. [at p.] 108.) Thus, an information charging murder in the terms of section 187 is 'sufficient to charge murder in any degree.'" (*People v. Harris* (2008) 43 Cal.4th 1269, 1294–1295, fn. omitted (*Harris*).) We have reaffirmed this rule many times following our decision in *Dillon* (see, e.g., *Contreras*, *supra*, 58 Cal.4th at p. 148; *People v. Jones* (2013) 57 Cal.4th 899, 968–969 (*Jones*); *Hughes*, *supra*, 27 Cal.4th at pp. 369–370), and do so again.

*Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) does not compel a different result. As we have previously noted, "the *Apprendi* court expressly declined to address the constitutional implications, if any, of omitting sentencing factors from accusatory pleadings. (*Apprendi*, [at p.] 477, fn. 3 [noting that no 'indictment question' was properly presented or actually addressed in the case].)" (*Contreras, supra*, 58 Cal.4th at p. 148.) Moreover, because *Apprendi* and its progeny address the right to a jury determination of sentencing facts beyond the elements of the charged offenses, the cases "do not create new notice requirements for alternative *theories* of a substantive offense such as a theory of first degree murder." (*People v. Abel* (2012) 53 Cal.4th 891, 938.) We continue to hold that the traditional California rule, under which a section 187 charge "places the defense on notice of, and allows trial and conviction on, all degrees and theories of murder," does not violate *Apprendi* or the Sixth Amendment. (*Contreras*, at p. 149.)

### b. *Failure to Require Unanimity on First Degree Murder Theory*

The jury was instructed on the alternative theories of premeditation and felony murder. Defendant now claims the court violated his rights under the Sixth, Eighth, and Fourteenth Amendments by failing to instruct that the jury must unanimously agree on a single theory of first degree murder in order to convict him. Again, as defendant acknowledges, this claim has been repeatedly rejected. (See, e.g., *Jones, supra*, 57 Cal.4th at p. 973; *People v. Taylor* (2010) 48 Cal.4th 574, 626; *People v. Nakahara* (2003) 30 Cal.4th 705, 712 (*Nakahara*).) " '[A]s long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by

which theory he is guilty.' " (*Rogers*, *supra*, 57 Cal.4th at p. 339.) Neither the federal Constitution (see *Schad v. Arizona* (1991) 501 U.S. 624, 640–642; *Harris*, *supra*, 43 Cal.4th at pp. 1295–1296) nor the *Apprendi* decision (see *People v. Tully* (2012) 54 Cal.4th 952, 1023–1024; *Nakahara*, at pp. 712–713) requires otherwise. We decline to reconsider this settled precedent. Further, given the special circumstance findings here, the jury necessarily reached unanimous agreement that defendant committed first degree felony murder in the course of a robbery and burglary. (See *Taylor*, at p. 626; *Harris*, at p. 1296.)

### c. Juror Misconduct Instruction

Although he did not object below, defendant now claims the court erred in giving CALJIC former No. 17.41.1, which instructed, "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation." After defendant's trial, we exercised our supervisory power in *People v. Engelman* (2002) 28 Cal.4th 436 to disapprove the use of this instruction in *future* criminal trials. We also concluded the instruction does not violate a defendant's state or federal constitutional rights to a jury trial, a unanimous verdict, or due process. (*Id.* at pp. 439–440.) Defendant argues the concerns addressed in *Engelman* have greater force in capital trials, but we have repeatedly rejected calls to depart from *Engelman*'s constitutional holdings in capital cases. (See, e.g., *People v. Johnson* (2018) 6 Cal.5th 541, 591–592 (*Johnson*); *People v. Penunuri* (2018) 5 Cal.5th 126, 157–158; *Rogers*, *supra*,

57 Cal.4th at pp. 339–340; *McKinnon*, *supra*, 52 Cal.4th at p. 681.)   The instruction did not violate defendant's constitutional rights and does not require reversal.

### d. *CALJIC Instructions Regarding Evaluation of Evidence*

Defendant also claims a series of pattern instructions undermined the state's burden to prove guilt beyond a reasonable doubt.   He first challenges instructions addressing the use of circumstantial evidence to prove guilt (CALJIC No. 2.01), mental state (CALJIC Nos. 2.02, 8.83.1), and special circumstances (CALJIC No. 8.83).   He argues these instructions required the jury to accept or draw incriminatory inferences if they appeared reasonable.   We will not revisit settled law here. (See, e.g., *Johnson*, *supra*, 6 Cal.5th at p. 592; *Harris*, *supra*, 43 Cal.4th at p. 1294; *Nakahara*, *supra*, 30 Cal.4th at pp. 713–714.) We reaffirm that "[t]he circumstantial evidence instructions did not permit, induce, or compel jurors to convict defendant or to sustain the special circumstance merely because he reasonably appeared to have committed the charged crimes.   [Citations.] Nor would the jury, when considering the circumstantial evidence instructions alongside the reasonable doubt instruction, somehow still have been misled about the requisite standard of proof." (*Contreras*, *supra*, 58 Cal.4th at pp. 161–162.)

Defendant next objects to a series of instructions on the jury's evaluation of witness testimony and the weight of evidence:   CALJIC No. 2.21.1 (discrepancies in witness testimony);   CALJIC No. 2.21.2 (witnesses willfully false); CALJIC No. 2.22 (conflicting testimony);   CALJIC No. 2.27 (sufficiency of single witness); and CALJIC No. 8.20 (finding deliberate and premeditated murder).   Defendant argues these

instructions diluted the state's burden of proof because they encouraged the jury to decide issues based on which side had the stronger evidence. We have rejected these claims before (see, e.g., *McKinnon, supra,* 52 Cal.4th at pp. 677–678; *Friend, supra,* 47 Cal.4th at p. 53; *Nakahara, supra,* 30 Cal.4th at p. 714), and defendant does not persuade us to do otherwise here. " ' "Jurors are not reasonably likely to draw, from bits of language in instructions that focus on how particular types of evidence are to be assessed and weighed, a conclusion overriding the direction, often repeated in voir dire, instruction, and argument, that they may convict only if they find the People have proven guilt beyond a reasonable doubt." ' ([*People v.*] *McKinzie*[ (2012)] 54 Cal.4th 1302, 1356–1357.) No reasonable juror would have 'parsed' these instructions and believed that the People had some lesser burden of proof." (*Contreras, supra,* 58 Cal.4th at p. 162.) Nothing in the prosecutor's closing argument calls for a different conclusion.

Finally, defendant contends CALJIC No. 2.51 improperly allowed the jury to determine guilt based on the existence of motive alone, lessening the state's burden of proof. The instruction simply provides that motive, while not an element of a crime, is a circumstance the jury may consider in determining guilt. We have consistently rejected defendant's precise claims of error (see, e.g., *Sattiewhite, supra,* 59 Cal.4th at p. 474; *Jones, supra,* 57 Cal.4th at p. 971; *People v. Snow* (2003) 30 Cal.4th 43, 97–98) and now reaffirm those holdings.

B. *Penalty Phase Issues*

1. *Admission of Hearsay*

Defendant argues the court improperly admitted hearsay implicating him in the Spokane murders. He contends this error

violated his rights to due process, confrontation, and a reliable penalty verdict. Any error in admitting the evidence was harmless.

### a. Background

During the prosecutor's questioning, defendant's girlfriend Onkhamdy testified that defendant and Giao Ly left the Spokane apartment where they were staying and later returned with money and jewelry. As Onkhamdy lay on a couch facing away from them, she heard defendant, Ly, and one or two other men dividing money. The prosecutor asked if she heard "any conversation among them regarding a murder," but Onkhamdy replied that all of the men were speaking Cambodian, a language she did not understand. Questioned further, Onkhamdy denied telling the investigating officers something different. The prosecutor tried to impeach her with notes from her police interview, in which she said she "knew from the conversation that the subjects had committed a murder." Defense counsel objected. He noted that defendant's remarks might be admissible as statements of a party if Onkhamdy could testify that defendant had made the statement. But instead three or four people were talking "and we don't know who said what." The court overruled the objection as premature and allowed the prosecutor to ask if Onkhamdy had told detectives she overheard a discussion about murder and it made her "nauseous to know what had occurred." Onkhamdy said she told the police she felt ill due to her pregnancy and denied saying anything about people discussing murder.

The prosecution then called Detective David Dillon, who was present during Onkhamdy's interview. Dillon testified that

Onkhamdy reported hearing defendant and the others discussing a murder, though she did not say who had mentioned murder or in what language. The court overruled defendant's hearsay objection and denied his motion for mistrial, concluding the evidence was admissible as an adoptive admission.

### b. *Discussion*

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless some exception to the hearsay rule is satisfied. (*Id.*, subd. (b).) "[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)

The challenged testimony involved two layers of hearsay: (1) Onkhamdy's statement to police; and (2) the underlying statement about "murder" in the conversation she described. Onkhamdy's statement was admissible as a prior inconsistent statement. A statement inconsistent with a witness's trial testimony "is not made inadmissible by the hearsay rule" (Evid. Code, § 1235) so long as the witness either had "an opportunity to explain or to deny the statement" while testifying or has not been excused from giving further testimony (Evid. Code, § 770, subd. (a)). These requirements were satisfied. Onkhamdy gave inconsistent testimony, and she was given an opportunity to explain her prior statement when she did so. Prior inconsistent statements admitted under Evidence Code section 1235 may be considered for their truth as well as for impeachment. (*People v. Homick* (2012) 55 Cal.4th 816, 859; *People v. Guerra* (2006) 37 Cal.4th 1067, 1144, disapproved on another ground in *People v.*

*Rundle* (2008) 43 Cal.4th 76, 151.)[19]  Accordingly, Onkhamdy's statement to police was properly admitted without limitation.

Whether the underlying hearsay from the overheard conversation was properly allowed is difficult to discern because details about the conversation are so vague.  All we know is that the topic of murder arose.  Without any information about what was said or by whom, it is unclear whether the foundational requirements were satisfied for the adoptive admission exception.  (See Evid. Code, § 1221.)  However, any error in admitting the testimony was clearly harmless.  Strong evidence tied defendant to the Spokane murders.  The only survivor, four-year-old Joe Hagan, unequivocally identified defendant as one of the perpetrators shortly after the crime, and defendant's fingerprint was found inside the Hagans' apartment.  Evans recalled seeing a gun at defendant's house of the same caliber used in the shootings.  Both Onkhamdy and Kunthea Sar testified that defendant and Ly went out on the night of the murders and returned with cash and jewelry, some of which was later identified as belonging to the victims.  In contrast to this evidence, vague hearsay about defendant's participation in a conversation held in a language the witness did not understand

---

[19]     *People v. Montiel* (1993) 5 Cal.4th 877, 929, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, footnote 13, suggested that a prior inconsistent statement, standing alone, is legally insufficient to establish aggravating conduct in the penalty phase of a capital trial.  However, that idea was based on a holding in *People v. Gould* (1960) 54 Cal.2d 621, 631, that we have since overruled.  (*People v. Cuevas* (1995) 12 Cal.4th 252, 257.)  We need not decide whether *Montiel*'s observations have continuing vitality because significant evidence beyond Onkhamdy's statement implicated defendant in the Spokane crimes.

was unlikely to have influenced the jury's decision. Moreover, the prosecutor never mentioned the "murder" conversation in closing argument. And there was significant aggravating evidence apart from the Spokane crimes, including defendant's involvement in two fatal drive-by shootings. The jury was also entitled to consider the grim facts of the charged offenses and the Sacramento murders. Considering the quantity and quality of the aggravating evidence, it is not reasonably possible the jury would have reached a different penalty verdict absent any asserted error. (See *People v. Pearson* (2013) 56 Cal.4th 393, 472.)

### 2. *Exclusion of Scrappy's Inculpatory Statements*

Defendant attempted to call "Scrappy" Tran to testify about his role in the Elm Street crimes. On counsel's advice, Scrappy refused to testify. Defendant then sought to introduce out-of-court statements in which Scrappy claimed he had killed Trinh and the three Nguyen children. The court excluded the evidence as insufficiently reliable to satisfy the hearsay exception for statements against interest. (Evid. Code, § 1230.) Defendant claims error under state and federal law, asserting violations of his constitutional rights to present mitigating evidence, obtain a fair trial, and have a reliable penalty determination. Although we agree with the trial court that the issue is close, we conclude the ruling was an appropriate exercise of discretion.

### a. *Background*

Scrappy was a minor at the time of the Elm Street crimes. He pled guilty to 10 counts in exchange for a sentence of 50 years to life imprisonment. A defense investigator interviewed him at Folsom State Prison during the guilt phase of defendant's trial.

The interview was taped, but Scrappy asked for the recorder to be turned off before discussing the Elm Street murders. Scrappy then said that after "the man" was shot, "he lost it or went crazy, shot the woman, [then] ran into the bedrooms and shot the children." He gave no further details about the shootings and did not indicate that he had been the one to shoot "the man." He told the investigator he was willing to testify in defendant's trial because he had become a Christian, felt responsible for the murders, and did not want defendant to be blamed for them all. However, he worried how other inmates would treat him if he admitted killing a woman and children. He also worried that he would incur new charges from an unrelated shooting.

A second defense investigator interviewed Scrappy shortly before the penalty trial. Scrappy again declined to be taped. He described the planning and entry into the Nguyen home in a manner similar to the guilt phase testimony of Evans and Karol. Inside the house, the father argued with defendant, whom the investigator called "Peter." According to the investigator's notes, Scrappy said: "The next thing I see is Peter acting weird. I hear a shot and Peter is standing over the father looking weird. Then I go crazy and start shooting the family. Quote: I killed the mother and the kids. I don't know why. I just went crazy. It's all fog." When pressed for more details, he shook his head and repeated, "I was in a fog."

Scrappy's appointed counsel advised him not to testify. Although Scrappy was serving a very long sentence, his trial attorney thought "there might be . . . a glimmer" of hope that he could obtain parole in 40 years, and an admission to killing children could "doom" his chances. He was also subject to prosecution for an additional uncharged murder. Fourteen-year-old Trang Vu's murder was initially charged against

defendant, but the prosecution dismissed it at the close of the penalty phase. Those accusations were not included in Scrappy's plea agreement.

Defendant attempted to introduce Scrappy's statements as declarations against penal interest. However, the court determined the foundation for that exception was not satisfied. The court observed Scrappy was "a proven liar" with no credibility. His current assertions were "completely contrary" to his previous statements to the police and investigators. Although he might have been motivated to clear his conscience by telling the truth, he might also have wanted to gain favor with fellow gang members by making up a story to exonerate their associate "from some very serious acts." The court also questioned whether the statements were truly against penal interest, given that Scrappy had pled guilty to all the murders, received a lengthy sentence, and his plea was final. Considering all the circumstances, the court did not find the hearsay statements sufficiently trustworthy to be admitted under the claimed exception.

### b. *Discussion*

Evidence Code section 1230 sets out the hearsay exception for statements against interest: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability . . . , or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he

believed it to be true." The rationale for the exception "is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) To satisfy the exception, the proponent " 'must show "that the declarant is unavailable, that the declaration was against the declarant's penal [or other] interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." ' " (*People v. Geier* (2007) 41 Cal.4th 555, 584 (*Geier*); see *People v. Duarte* (2000) 24 Cal.4th 603, 610–611 (*Duarte*).) We review the trial court's ruling for abuse of discretion. (*People v. Westerfield* (2019) 6 Cal.5th 632, 704 (*Westerfield*); *Grimes*, at p. 711.) Its decision will not be disturbed on appeal " 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Brown* (2003) 31 Cal.4th 518, 534 (*Brown*); see *Geier*, at p. 585.)

The parties agree Scrappy became unavailable as a witness when he asserted the privilege against self-incrimination. (See Evid. Code, § 240, subd. (a)(1).) But support for the hearsay exception's other two requirements is not so clear. As the trial court observed, it is questionable whether Scrappy's claim to have shot Trinh and the Nguyen children was truly against his interests. "In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the

declarant's relationship to the defendant." (*People v. Frierson* (1991) 53 Cal.3d 730, 745 (*Frierson*).) Scrappy's statements implicated him in serious criminal activity, and the record suggests he personally feared opprobrium from the prison community and the public at large for becoming known as a child killer. However, he had already been convicted and was serving a lengthy sentence for the same crimes. Belatedly claiming that he was the primary shooter at Elm Street added little to his own admission of guilt and could not result in additional punishment. Defendant argues the admission would have ruined Scrappy's chances of obtaining parole, but the only evidence that Scrappy would have "a glimmer" of such hope 40 years later was hearsay that his current counsel repeated hearing from his trial counsel. Similarly, Scrappy was purportedly concerned about the effect his statement might have on a motion for a new trial, in the event he later decided to withdraw his guilty plea. The court could well conclude these potential consequences were too speculative or remote to impinge on penal interest for purposes of Evidence Code section 1230.

"[E]ven when a hearsay statement runs generally against the declarant's penal interest . . . , the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission." (*Duarte, supra*, 24 Cal.4th at p. 614.) " 'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.' " (*Frierson, supra*, 53 Cal.3d at p. 745.) The trial court here did so, and it did not abuse its discretion in concluding the statements were too unreliable to be admitted.

Scrappy did not take responsibility for the shootings until he was interviewed by defendant's investigators, years after the crimes occurred. "The significant passage of time is a relevant circumstance to be considered when determining a statement's reliability." (*People v. Masters* (2016) 62 Cal.4th 1019, 1057; see *Frierson*, *supra*, 53 Cal.3d at p. 745.) In addition, as the court observed, Scrappy was a demonstrated liar, and his current account was "completely contrary" to all of his previous statements. In the past, Scrappy had not only denied his own responsibility to both the police and investigators, but at one point he had falsely claimed Pan was personally involved in the shootings. That assertion was later disproved when evidence indisputably showed Pan was nowhere near the crime scene. Inconsistent accounts cast doubt on the reliability of a declarant's statements. (See *Geier*, *supra*, 41 Cal.4th at p. 585.)

Although defendant did not raise the point below, he now contends the court should have considered the reliability of Scrappy's account in light of corroborating evidence from the trial. Before announcing its decision, the court remarked that appellate case law prohibited it from using trial evidence as corroboration of a statement against interest's truthfulness, remarking that it would be impermissible bootstrapping to look beyond the circumstances surrounding the declaration's utterance. It appears the court was referencing the United States Supreme Court's decision in *Idaho v. Wright* (1990) 497 U.S. 805. There, under its pre-*Crawford*[20] jurisprudence, the high court held the confrontation clause requires that "hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by

---

[20] *Crawford v. Washington* (2004) 541 U.S. 36.

reference to other evidence at trial." (*Wright*, at p. 822.) The court reasoned that "the use of corroborating evidence . . . would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial, a result" that was at odds with the confrontation clause. (*Id.* at p. 823.) *Wright* was addressing the constitutional requirements governing admission of a hearsay statement *against* a criminal defendant, however. Because *defendant* was the one seeking to introduce a hearsay statement against interest here, there was no confrontation issue, and the trial court was free to examine all facts bearing upon the statement's trustworthiness. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 607; *Frierson, supra*, 53 Cal.3d at p. 745.) This was precisely the sort of mistake the court could have easily corrected if the issue had been brought to its attention. Nevertheless, defendant said nothing, and thereby forfeited the issue on appeal. (See *People v. Romero* (2008) 44 Cal.4th 386, 411.)[21]

---

[21] That said, we are not persuaded that the court's mistake led it to abuse its discretion. Defendant argues Scrappy's account was corroborated by evidence that two guns were used in the Elm Street crimes. Because a shell casing that came from a second gun was not available for testing until the close of the guilt phase, the evidence initially established that a single gun was used in the shootings. (See *ante*, fn. 7.) Scrappy's statement was consistent with the later discovery that one bullet was fired from a second gun. However, this alignment between Scrappy's statement and the ballistics evidence does not necessarily mean his assertion that he shot all but one of the victims was truthful. It is beyond dispute that Scrappy participated in the crimes. Unlike Karol and Evans, he was inside the house with defendant the entire time. He would have known how many guns were fired.

In addition, although admitting to the murder of a mother and her children would likely subject a person to "hatred, ridicule, or social disgrace" (Evid. Code, § 1230) within the *general* community, certain aspects of Scrappy's *particular* community meant he could actually benefit from making a false confession. Defendant was a high-ranking gang leader; Scrappy a juvenile and relative newcomer to the gang. Scrappy might have believed that taking the blame for a more senior member's crimes, thus helping him evade the death penalty, could enhance his position in the gang or help to secure his safety in prison. Because he faced little to no risk of additional penal consequences, the possibility of general opprobrium might have been worth these potential benefits. This was the scenario we envisioned in *Grimes* when we observed that "sometimes a declarant who makes an inculpatory statement may have a substantial incentive to exculpate others. A member of a criminal street gang, for example, may choose to take the fall for fellow gang members by making a confession that exculpates them. A trial court in that situation may reasonably conclude that the declarant's incentive to protect his friends renders the exculpatory portions of the statement inadmissible." (*Grimes*, *supra*, 1 Cal.5th at p. 716; see *Frierson*, at p. 745.) The court did not abuse its discretion in concluding Scrappy's hearsay statements were not sufficiently trustworthy to be admitted as statements against interest.

Defendant protests that it was fundamentally unfair for the court to permit the prosecutor "to build his entire case on the testimony of self-serving co-defendants whose various stories changed continuously" but then exclude the statements of another codefendant as unreliable. This objection overlooks the most crucial difference between Scrappy's account and those

of Karol and Evans. Karol and Evans testified in court. They were subject to extensive cross-examination, which allowed the jury to evaluate their truthfulness. Scrappy did not testify. His unavailability for cross-examination is why the court had a duty to carefully scrutinize the reliability of his out-of-court statements. " '[A] defendant does not have a constitutional right to the admission of unreliable hearsay statements.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 269.) The court's ruling was neither statutory nor constitutional error. (See *Westerfield*, *supra*, 6 Cal.5th at p. 705.)

### 3. *Instructional Error Claims*

Defendant next argues the court should have modified the standard penalty-phase instructions to include additional concepts and should have refused to give a special instruction regarding victim impact. The instructions given were accurate and appropriate under settled law. There was no error.

#### a. *Refusal to Modify CALJIC No. 8.85*

"CALJIC No. 8.85 instructs the jury regarding the aggravating and mitigating factors listed in section 190.3, factors (a) through (k), which the jury must consider in deciding the penalty to be imposed on a capital defendant." (*People v. Linton* (2013) 56 Cal.4th 1146, 1210.) Defendant argues the court erred in refusing several proposed modifications.

First, defendant contends the court erred in refusing to instruct the jury that it could consider lingering or residual doubt regarding guilt as a mitigating factor in setting penalty. As he recognizes, however, "we have frequently and consistently rejected claims that the trial court is required to instruct on lingering doubt." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 325; see *People v. Howard* (2010) 51 Cal.4th 15, 38.) The

concept is sufficiently covered in CALJIC No. 8.85 and other instructions typically given in capital cases. (*People v. Enraca* (2012) 53 Cal.4th 735, 767; *People v. Panah* (2005) 35 Cal.4th 395, 497 (*Panah*).)

Next, defendant asserts the court improperly rejected two modifications he proposed regarding how the jury should consider his age and maturity. Although he was 22 years old when he committed the charged crimes, the defense argued a traumatic childhood hindered his cognitive and emotional development. Defendant first sought an instruction that the jury could consider his "psychological immaturity" as a mitigation factor. The court did not err in refusing this expansion. We have repeatedly held courts are not required to instruct that age is relevant only in mitigation. (*People v. Burney* (2009) 47 Cal.4th 203, 257–258; *Panah*, *supra*, 35 Cal.4th at pp. 499–500.) The instructions as a whole permitted the jury to consider both defendant's age and his psychological immaturity as mitigating considerations. (*People v. Booker* (2011) 51 Cal.4th 141, 194; *Burney*, at p. 258.) Defendant's second proposed modification would have related that people under age 18 are not eligible for the death penalty or a sentence of life without parole. We upheld the rejection of a similar instruction, proposed by a 19-year-old defendant, in *Brown*, *supra*, 31 Cal.4th 518. We noted that " '[a]lthough instructions pinpointing the *theory* of the defense might be appropriate, a defendant is not entitled to instructions that simply recite facts favorable to him.' (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1159.) By instructing the jury that those younger than 18 years old are legally ineligible for the death penalty, the proffered instruction highlighted a single, mitigating aspect of defendant's age — that he had only recently become eligible for

the ultimate penalty — and was thus improperly argumentative." (*Id.* at pp. 564–565.) Defendant's proposed modification was appropriately refused here for the same reason.

Defendant also proposed advising the jury that it could consider the fact that his accomplices received more lenient sentences. The court did not err in refusing this request. "We have consistently held that evidence concerning coparticipants' sentences is properly excluded from the penalty phase of a capital trial because such evidence is irrelevant." (*People v. Moore* (2011) 51 Cal.4th 1104, 1141; see *People v. Thomas* (2012) 54 Cal.4th 908, 940.) "The focus in a penalty phase trial of a capital case is on the character and record of the individual offender. The individually negotiated disposition of an accomplice is not constitutionally relevant to [a] defendant's penalty determination." (*People v. Johnson* (1989) 47 Cal.3d 1194, 1249.) Defendant argues a different rule should apply in his case because the jury, having rejected the personal use firearm enhancements in the guilt phase, necessarily concluded one of his accomplices was the actual shooter. This logic fails. The guilt-phase verdict merely reveals that the jury determined the evidence was insufficient to prove which attacker fired the fatal shot at any particular victim. Nothing about the verdict, nor the facts of this case, made the accomplices' sentences relevant to the jury's determination of defendant's proper punishment.

Finally, defendant argues the court should have approved his request to supplement CALJIC No. 8.85 with an admonition not to decide penalty "by the simple process of counting the number of [aggravating and mitigating] circumstances on each side." The jury was instructed with this same concept in

CALJIC No. 8.88, which explained that the "weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them." Defendant complains that CALJIC No. 8.88 was read after closing arguments and was not given with the other instructions. He overlooks the fact that his own counsel specifically requested that the court present the instructions in the order it did. There was no error.

### b. *Refusal to Modify CALJIC No. 8.88*

Defendant asked that CALJIC No. 8.88 be modified to add that jurors could return a verdict of life imprisonment without parole even if they found that one or more aggravating factors outweighed the mitigating factors. Although the court was initially inclined to adopt a version of defendant's proposal, it ultimately decided to give the standard, unmodified instruction. Defendant now claims this refusal to modify CALJIC No. 8.88 was error. We disagree.

It is settled that CALJIC No. 8.88 accurately describes the capital jury's weighing task and is not unconstitutional. (*People v. Dykes* (2009) 46 Cal.4th 731, 816–817.) Specifically, the instruction is not constitutionally flawed "for failing to affirmatively allow the jury to impose a life sentence even if the aggravating factors outweigh the mitigating ones." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1028.) Nor is the trial court obligated to instruct that the jury cannot return a death judgment unless it finds aggravating factors " 'outweigh[]' " mitigating factors. (*Panah, supra*, 35 Cal.4th at p. 498.) "[T]he standard version of CALJIC No. 8.88, read as a whole, accurately describes the individualized, normative nature of the

sentencing determination, and properly guides the jury's discretion in this regard." (*Contreras, supra,* 58 Cal.4th at p. 170.) Defendant contends his modification was "better" and "more accurately stated the law." Even if this were true, it would not mean instructing the jury with unmodified CALJIC No. 8.88 was error. It was not.

### c. *Pinpoint Instruction on Child Victim Impact*

At the prosecution's request, the court instructed the jury that it could "consider the impact [of] the defendant's crime on the surviving victim, Dennis Nguyen, . . . as part of the circumstances of the crime of which defendant was convicted" under section 190.3, factor (a). Although it is unclear whether he raised an objection below, defendant now contends the instruction was argumentative because it improperly singled out one side's evidence for specific mention.

We have rejected similar claims (*People v. Souza* (2012) 54 Cal.4th 90, 139; *People v. Harris* (2005) 37 Cal.4th 310, 358–359), and do so again. The jury was entitled to consider as a circumstance of defendant's capital crimes the harm caused to the victims' families. (§190.3, factor (a); *People v. Edwards* (1991) 54 Cal.3d 787, 833–836.) Moreover, the jury's consideration of victim impact "need not be based upon specific testimony of the victim's family members describing their emotions." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1017.) The prosecutor did not present victim impact evidence, but his closing argument asked the jury to consider how defendant's crimes affected Dennis. The pinpoint instruction appropriately informed the jury how it could take this victim impact into account. (See *Harris,* at p. 358.)

### 4. *Constitutionality of Death Penalty Law*

Defendant raises a number of familiar challenges to the constitutionality of California's death penalty statute and instructions. While acknowledging that we have previously rejected all of these arguments, he presents them again to urge reconsideration and preserve the issues for federal review. We decline to reconsider our previous holdings that:

- The class of offenders eligible for the death penalty is not impermissibly broad. (*People v. Potts* (2019) 6 Cal.5th 1012, 1060 (*Potts*); *People v. Reed* (2018) 4 Cal.5th 989, 1018.)

- Section 190.3, factor (a), which permits aggravation based on the circumstances of the crime, does not result in arbitrary and capricious imposition of the death penalty. (*People v. Rhoades* (2019) 8 Cal.5th 393, 455 (*Rhoades*); *People v. Capers* (2019) 7 Cal.5th 989, 1013 (*Capers*).)

- California's death penalty scheme does not violate the federal Constitution for failing to require: written findings (*People v. Molano* (2019) 7 Cal.5th 620, 678 (*Molano*)); unanimous findings as to the existence of aggravating factors or unadjudicated criminal activity (*Capers, supra,* 7 Cal.5th at p. 1013); or findings beyond a reasonable doubt as to the existence of aggravating factors (other than factor (b) or (c) evidence), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty (*People v. Fayed* (2020) 9 Cal.5th 147, 213 (*Fayed*); *People v. Krebs* (2019) 8 Cal.5th 265, 350 (*Krebs*)). These conclusions are not altered by *Apprendi, supra,* 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, or *Hurst v. Florida* (2016) 577 U.S. 92. (*Rhoades, supra,* 8 Cal.5th at p. 455; *Capers,* at pp. 1013–1014.)

- The prosecution has no obligation to bear a burden of proof or persuasion because sentencing is "an inherently moral and normative function, and not a factual one amenable to burden of proof calculations." (*People v. Winbush* (2017) 2 Cal.5th 402, 489; see *People v. Hoyt* (2020) 8 Cal.5th 892, 954 (*Hoyt*); *Capers, supra*, 7 Cal.5th at pp. 1014–1015.) Further, " 'the trial court is not required to explicitly tell the jury that neither party bears the burden of proof.' " (*Potts, supra*, 6 Cal.5th at p. 1060.)

- The federal Constitution does not require an instruction that life is the presumptive penalty. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 670 (*Beck and Cruz*)); *Capers, supra*, 7 Cal.5th at p. 1016.)

- CALJIC No. 8.88 is not impermissibly flawed because it does not require a finding that death is the "appropriate" penalty (see *People v. Leon* (2020) 8 Cal.5th 831, 853; *Beck and Cruz, supra*, 8 Cal.5th at p. 671), or because it does not require a life sentence if the jury finds mitigating factors outweigh aggravating ones (*Capers, supra*, 7 Cal.5th at p. 1016; *Johnson, supra*, 6 Cal.5th at p. 594). The instruction's use of the phrase "so substantial" does not make it overbroad or unconstitutionally vague. (See *Beck and Cruz*, at p. 671; *People v. Ghobrial* (2018) 5 Cal.5th 250, 293.)

- CALJIC No. 8.85's use of the words "extreme" and "substantial" does not impermissibly constrain the jury's consideration of mitigating circumstances. (See *Molano, supra*, 7 Cal.5th at p. 678; *People v. Rices* (2017) 4 Cal.5th 49, 94.) The court was not constitutionally required to delete inapplicable sentencing factors, identify which factors are aggravating or mitigating, or instruct that certain factors are

relevant only for mitigation. (*Krebs, supra,* 8 Cal.5th at p. 351; *Potts, supra,* 6 Cal.5th at p. 1061.)

- The federal Constitution does not require intercase proportionality review. (*Hoyt, supra,* 8 Cal.5th at p. 955; *Rhoades, supra,* 8 Cal.5th at pp. 455–456.)

- The death penalty law does not violate equal protection because it provides different procedures for capital and noncapital defendants. (*Fayed, supra,* 9 Cal.5th at p. 214; *Rhoades, supra,* 8 Cal.5th at p. 456.)

- California's capital sentencing scheme does not violate international law or the Eighth Amendment. (*Beck and Cruz, supra,* 8 Cal.5th at p. 671; *Molano, supra,* 7 Cal.5th at p. 679.)

### C. *Restitution Fine*

At the time of defendant's crimes, section 1202.4, subdivision (b) required the court to impose a felony restitution fine between $200 and $10,000. Although the fine was mandatory, a defendant's inability to pay could be considered in setting the amount. (§ 1202.4, former subd. (d).) In considering defendant's plea for a reduced fee, the court observed the question was whether to exercise mercy to allow defendant "to get whatever benefits he might receive from his income at the prison during his stay there." It ultimately ordered him to pay the maximum fine of $10,000. Defendant now claims this order was an abuse of discretion because it was "based on the fiction" that he could receive income while in prison.

These arguments misapprehend the burden of proof. Under governing law, it is the *defendant* who must "bear the burden of demonstrating his or her inability to pay." (§ 1202.4, subd. (d).) As in other capital cases, defendant "contends his

indigence is established by the fact that he was appointed counsel and provided funds for expert witnesses and investigators, and because he assertedly has no earning potential. However, the fact that he could not afford the cost of the defense in a capital case does not establish that he cannot pay these fines." (*People v. Miracle* (2018) 6 Cal.5th 318, 356.) Defendant "points to no evidence in the record supporting his inability to pay, beyond the bare fact of his impending incarceration." (*People v. Gamache* (2010) 48 Cal.4th 347, 409.) The record indicates the trial court was aware of its duty to consider defendant's ability to pay the fine but exercised its discretion to impose the maximum amount. Considering the gravity of defendant's offenses and the losses he inflicted on multiple victims (see § 1202.4, subd. (d)), we cannot conclude this order was an abuse of discretion. (See *Potts, supra,* 6 Cal.5th at p. 1057.)

Nor is there merit to defendant's claim that the court violated *Apprendi, supra,* 530 U.S. 466 in imposing the fine without jury findings. *Apprendi* holds that: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.) The rule can also be implicated when criminal fines are imposed. (*Southern Union Co. v. United States* (2012) 567 U.S. 343, 346.) However, *Apprendi* does not apply to the setting of a fine under section 1202.4. As we have previously explained, this mandatory restitution fine "is properly understood as part of the maximum penalty statutorily authorized by a jury's finding that the defendant is guilty of a felony." (*People v. Wall* (2017) 3 Cal.5th 1048, 1076.) In imposing the fine, a court does not make any factual finding that increases the range of

penalties to which the defendant is exposed. It simply sets a fine within the prescribed statutory range. (*People v. Henriquez* (2017) 4 Cal.5th 1, 47.) "Its ruling therefore raises no concerns under *Apprendi*." (*Id.* at pp. 47–48.)[22]

### D. *Cumulative Error*

Finally, defendant argues errors in his trial were cumulatively prejudicial. We assumed potential errors in the court's failure to admonish support persons each time they accompanied a witness and in the admission of hearsay at the penalty phase. We found no reasonable possibility either assumed error could have affected the verdict and now conclude no cumulative prejudice rendered defendant's trial unfair. (See, e.g., *Potts*, *supra*, 6 Cal.5th at p. 1058.)

---

[22] Defendant also argues his obligation to pay the fine should be stayed pending the finality of his automatic appeal, but, as he recognizes, an appeal to this court "stays the execution of the judgment in all cases where a sentence of death has been imposed." (§ 1243.) No additional stay is required.

## III.  DISPOSITION

The judgment is affirmed.


**CORRIGAN, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**KIM, J.**[*]

––––––––––––––––––––––––––

[*]      Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Chhoun
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S084996
**Date Filed:**  February 11, 2021
_____

**Court:**  Superior
**County:**  San Bernardino
**Judge:**  Bob N. Krug

_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court; Denise Anton and Alexander Post, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Chief Assistant Attorney General, Joseph P. Lee and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alexander Post
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA 94607-4139
(510) 267-3300


Toni R. Johns Estaville
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6166