Filed 3/3/25  P. v. Armenta CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>　Plaintiff and Respondent,<br><br>v.<br><br>JASON ARMENTA,<br><br>　Defendant and Appellant. | 2d Crim. No. B328034<br>(Super. Ct. No. 2021010124)<br>(Ventura County) |

　　　　Jason Armenta appeals the judgment after a jury convicted him of first degree murder (Pen. Code,[1] § 187, subd (a); count 1) and attempted murder (§§ 664/187, subd. (a); count 2).  The jury found true the allegation on count 1 that Armenta personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)) and on count 2 that he personally and intentionally used and discharged a firearm for the benefit of, at the direction of, or in association with a criminal street gang (*id.*, subds. (b), (c)

---

[1] Further unspecified statutory references are to the Penal Code.

& (e)(1)).  In a bifurcated trial, the jury found true the allegation that he committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)).  Armenta was sentenced to a total of 50 years to life (25 years to life for count 1 plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and a concurrent life sentence with the possibility of parole after 15 years on count 2 plus 20 years for the firearm enhancement (§ 12022.53, subd. (c)).

Armenta contends (1) he was denied his right to retained counsel of choice, (2) the trial court erroneously admitted prejudicial gang evidence, (3) instructional error, (4) the firearm enhancement on count 2 must be vacated, (5) the gang enhancement must be reversed, (6) cumulative error, (7) resentencing was required under Senate Bill No. 81 (2021-2022 Reg. Sess.) (Senate Bill 81), and (8) the abstract of judgment must be modified.  We modify the abstract of judgment to correct the sentence on count 2 and to strike conduct credits, but otherwise affirm.

FACTUAL AND PROCEDURAL HISTORY

*Guilt phase*

The Squires Drive Chiques gang (the Squires) has 20 to 40 members/associates, and its claimed territory is in Oxnard, south of Pleasant Valley Road, east of Saviers Road, including Squires Drive, Howell Road, and Cypress Road.  Squires members congregate at the "dead-end"[2] of Howell Road.  The Squires wear San Diego Padres and Chargers clothing, which bears the "SD" logo.

---

[2] The dead end is the end of Howell Road.  There is a wrought iron fence at the end of the road.

2

Armenta associated with the Squires gang. Joel Romero, Joseph Rodarte, and Adrian Apodaca were members or associates of the Squires. Romero was a relative of Armenta's father, and he lived on Howell Road.

The Squires rival gang was the South Side Chiques (the SS). The SS had about 200 to 400 members/associates, and its territory in Oxnard was west of Saviers Road, south of Pleasant Valley Road, and east of Ventura Road. SS members congregate on Cuesta del Mar, a residential street. Cristobal Gonzalez and Alvaro Hernandez were members or associates of the SS gang.

On April 4, 2021, Armenta and his girlfriend, Desiree Giles, were at their apartment when he received a phone call that made him upset. Armenta told Giles that someone was at his uncle's house being disrespectful. He said that he was going to go to his uncle's house, which was "[s]omewhere around Howell Road." A surveillance video showed his car, a gray Honda Accord, leaving his carport at 6:13 p.m. At 6:19 p.m., Giles sent Armenta a text message saying, "Be careful please."

At 7:01 p.m., Armenta texted Giles to open the garage "quic[k]." Armenta parked and began pacing around the apartment and was "hyped-up." Armenta appeared agitated and said, "Fuck that. Why would they go starting problems at [my] uncle's house?" Later that evening, Armenta told Giles he was going to a friend's house in San Bernardino. He packed his clothes and left in his car. He returned a week later with a different car.

Earlier in the evening on April 4, Marisol Lopez was at her house on the dead end of Howell Road when she saw a Ford Mustang driving slowly. Two men got out the car and began yelling they were from South Side and yelled, "fuck Squires." At

3

6:06 p.m. Lopez called 911 and told the operator there were SS gang members yelling in front of her house. Lopez heard 10 to 20 gunshots and called 911 again at 6:56 p.m. Lopez told the operator, "They're shooting now." Lopez said that someone had been shot and the body was on the ground.

Monica Cruz also lived at the dead end on Howell Road and was arriving home just before 7:00 p.m. on April 4. She saw three males standing outside near the parked cars in front of her house. Soon after she walked into the house, she heard several gunshots. She saw one of the men fall in front of a car and get run over by the car as it drove away.

Surveillance videos showed Cristobal Gonzalez and Alvaro Hernandez from the SS gang, and Gonzalez's brother standing near a Mustang on Howell Road. Gonzalez and Hernandez appeared to flash SS gang signs. A car drove up on Squires Drive, which ran perpendicular to the dead end of Howell Road, and the shooter ran out of the car. The shooter fired several shots, Gonzalez fell, and the shooter ran back to the car. Oxnard police officers arrived at the scene and saw Gonzalez bleeding in the street. He was transported to the hospital; he later died from the gunshot wound to his head.

The officers found 15 expended bullet cartridges at the scene. They were fired from the same firearm. Several of the cartridges were manufactured by SAR, an unusual brand of ammunition.

A surveillance video showed a dark gray Honda Accord enter a housing complex on Squires Drive about a minute before the shooting. The police traced the Accord to Armenta.

Eight days after the shooting, a police officer stopped a car driven by Armenta and with Romero and another Squires gang

4

member/associate as passengers. Romero had a loaded gun in his pocket. The police confiscated Armenta and Romero's cell phones. A search of Armenta's phone revealed that on April 4 at 6:08 p.m., he received a call from Romero lasting about one minute. At 6:52 p.m., Armenta sent an audio message to Romero, in which he said, "I was about to let off on a fuckin' paisa on Cuesta[3] that just kept dogging." A search of Romero's phone showed an image of Gonzalez and Hernandez outside the Mustang at the dead end on Howell Road, where Gonzalez was later shot. Romero sent this photo to someone on a social media account at 6:13 p.m. on the day of the shooting.

Armenta's cell phone records showed that on the day of the shooting, his phone was in the area of the crime scene around 6:56 p.m. A few minutes later, Armenta's phone was near his home. Around 10:20 p.m., his phone was in the San Bernardino area.

Nine days after the shooting, police officers located Armenta's Honda at his mother's residence in Palmdale. The police later executed a search warrant at Armenta's home. They found a parking citation issued to a Honda, a San Diego Padres hat and hoodie sweatshirt, an empty gun holster "velcro-ed" to a body armor vest, a firearm (not the murder weapon) loaded with various ammunition, including SAR ammunition.

*Bifurcated gang allegation trial*

Oxnard Police Detective Ricardo Vega testified as a gang expert in both the guilt phase and the bifurcated gang allegation trial. He opined that the charged offenses were committed to benefit the Squires gang more than reputationally. Vega

---

[3] "Cuesta" is in reference to Cuesta Del Mar, which is SS territory.

5

explained the murder and attempted murder was an act in retaliation against the rival SS gang after they drove into Squires gang territory and "disrespect[ed]" the territory.

For the predicate offenses, the prosecution relied on two firearm offenses by active Squires gang members, Israel Juarez and Adrian Apodaca. The prosecution proffered certified records of Juarez's sustained juvenile petition for carrying a loaded firearm (§ 25850, subd. (a)) in 2018. At the time of the offense, Juarez was in a car with other Squires gang members on Howell Road. Vega testified that Squires members "carry firearms in case a violent confrontation rises upon them especially in their own neighborhood. My understanding is that there had been shootings prior to that arrest in the Squires Drive neighborhood possibly from rival gang members." Vega testified the offense more than reputationally benefited the gang by "defending their own turf."

For the second predicate offense, the prosecution proffered evidence of a firearm offense in March 2021. To establish this offense, the prosecution presented certified records of two of Apodaca's felony convictions for unlawfully taking or driving a vehicle (Veh. Code, § 10851) in 2015, and carrying a concealed firearm (§ 25400 subd. (a)(2)) in 2016 with a special allegation that he was a convicted felon carrying a firearm. The prosecution also presented a video of four Squires gang members, including Apodaca, at a shooting range in March 2021. Vega testified that Apodaca was a person prohibited from possessing a firearm. In the video, all individuals were wearing Squires gang attire. Apodaca said he was "training up his little homies," which meant he was training the younger gang members in using firearms in case they need to use it against a rival or to protect themselves in

6

their own neighborhood. Vega opined the conduct benefited the gang because its members could "talk about what's going on in the Squires Drive neighborhood, who they're committing crimes towards, and also practicing their shooting and being trained up on firearms."

DISCUSSION

*Request to substitute counsel*

Armenta contends the trial court erred in denying his constitutional right to retained counsel of choice. We disagree.

*1. Relevant facts*

In April 2021, Armenta retained private counsel, Martin Zaehringer, who represented Armenta at the preliminary hearing. On March 22, 2022, the parties announced ready for trial, and the last day for trial was April 1, 2022.

On April 1, 2022, Zaehringer informed the trial court that Armenta wished to substitute Christopher Welch as counsel. Welch asserted that Armenta had "strong concerns and wishes to change counsel, regardless of it being . . . Welch, the Public Defender, or other counsel." Welch stated he was "ready to enter the case with a minimum of six months estimate to prepare for trial." Welch also noted the case was "not even a year old which is almost unheard of in getting a homicide case to trial." The prosecutor objected to the substitution as untimely. She also contended that the parties had announced readiness for some time and that some witnesses, including Hernandez, were reluctant to testify and required a court order to ensure their presence. She also argued that a continuance of at least six months was "an inordinate amount of time" and a "complete injustice." Zaehringer explained that Armenta "indicated that he no longer has confidence and faith in me." He also noted that

7

payment for the retainer fee was not an issue in this case. Welch acknowledged that he had been "contacted at the last minute."

Armenta personally explained to the trial court that he was requesting a lawyer late "only because [he was] expecting [his] lawyer to come visit [him] before today many times to talk over [his] case. And [he hasn't]." He had only seen Zaehringer about two or three times in the past year and did not "feel comfortable with the investigation that has been done to support [his] defense." Armenta said he only needed one week "to finish the financial deal with [Welch]."

The trial court denied the motion to substitute counsel. It reasoned that this case "had been ready and is ready." It noted that it was "confident that Mr. Zaehringer is ready to try this case, [with] the same skill and ability that he's demonstrated throughout his career." The court recognized that this case involved a "particularly notorious gang" and that "witness intimidation [was] a serious issue in the People's presentation. And every day of delay that goes by jeopardizes further the likelihood that those witnesses are going to be available" and willing to testify. The court found that substitution of counsel would "disrupt the orderly process of justice."

### 2. Analysis

"The right to retained counsel of choice is—subject to certain limitations—guaranteed under the Sixth Amendment to the federal Constitution." (*People v. Verdugo* (2010) 50 Cal.4th 263, 310.) In California, this right reflects not only a defendant's choice of an attorney, but also their decision to discharge an attorney. (*Id*. at p. 311.) However, the right to discharge a retained attorney is not absolute. A trial court has discretion to deny a motion to relieve counsel " 'if discharge will result in

8

"significant prejudice" to the defendant [citation], or if it is not timely, i.e., if it will result in "disruption of the orderly process of justice" [citations].' [Citations.]" (*Ibid*.) In evaluating whether a motion to discharge counsel is timely, the trial court considers the totality of circumstances. (*People v. Maciel* (2013) 57 Cal.4th 482, 513 (*Maciel*).) We review the decision to relieve counsel for abuse of discretion. (*Verdugo*, at p. 311.)

There was no abuse of discretion here. Armenta's motion to substitute counsel was made on the last day for trial, after the parties had indicated readiness for trial. New counsel was contacted "last minute" and requested an open-ended continuance of at least six months. The court considered the potential serious consequences of this delay in a case where witness intimidation was a concern, exacerbating witnesses' reluctance to testify. (See *Maciel*, *supra*, 57 Cal.4th at p. 513.) The court also considered the absence of inadequate representation by Zaehringer. (See *ibid*. [court considered "the absence of abandonment or inadequate representation by counsel or an actual conflict of interest" in denying the motion to relieve counsel].) Given these circumstances, it was not arbitrary, capricious, or outside the bounds of reason for the court to deny the substitution request.

Armenta relies on *People v. Williams* (2021) 61 Cal.App.5th 627 (*Williams*), but that case is distinguishable. In *Williams*, after the court denied the *Marsden* motion, the defendant moved to substitute appointed counsel for retained counsel and sought a four-month trial continuance. Retained counsel informed the prosecutor and the court six days before the day set for the start of trial that she intended to request substitution. At the hearing, retained counsel explained that the defendant's mother spoke to

9

her six weeks prior, but the mother did not have the money for the retainer fee. (*Id.* at pp. 643-644.) The prosecutor opposed the motion, primarily focusing on the inconvenience it would cause a material witness who lived out of state. The prosecution expended considerable resources to secure the witness at trial and the delay caused the witness anxiety. (*Id.* at pp. 641-642.) The trial court denied the substitution motion. The appellate court reversed, noting the record contained " 'compelling circumstances' " that mitigated the tardiness of the motion, including the *Marsden* hearing, which was delayed at no fault of the defendant, and the considerable several-week effort to obtain funds necessary for retained counsel. (*Id.* at pp. 652-653.) The court also noted the defendant retained counsel "nearly a week *prior* to the trial," and that counsel acted "promptly to alert" the court and prosecutor. (*Ibid.*)

Unlike *Williams*, Armenta did not present "compelling circumstances" that would excuse the late substitution request. Welch was contacted "last minute," and the prosecutor was informed of the request the day before the last day for trial. Welch also indicated he would need *a minimum* of a six-month continuance, whereas the retained counsel in *Williams* indicated she needed a set four months. (*Williams*, *supra*, 61 Cal.App.5th at p. 657.) Additionally, the prosecutor in *Williams* only argued the inconvenience, but not unavailability, of the key witness. (*Id.* at p. 655.) But here, the court emphasized the serious consequences of witness intimidation and reluctance to testify if the case were delayed. Moreover, unlike *Williams*, there was no financial impediment that caused the delay. There was no abuse of discretion in denying the request to substitute counsel and postpone the trial.

*Gang evidence in guilt phase*

Armenta contends the trial court erred by admitting highly prejudicial gang evidence during the guilt phase of trial. We conclude there was no prejudicial error.

*1. Relevant proceedings*

Before trial on the substantive offenses, the prosecution moved to admit gang evidence in their case-in-chief to show motive and intent. Over Armenta's objection, the trial court admitted the gang evidence. The court found that "testimony about what a criminal street gang is and the history of the particular street gangs involved in this case . . . and the dynamics that are involved in how they conduct themselves, how they are related to each other, how they react to certain provocations, all would be appropriate territory for evidence. And then, obviously, the extent to which the victims and the defendant were associated with respective street gangs . . . and opinions that would flow from that . . . that would involve opinion testimony."

The trial court instructed the jury that it may consider evidence of gang activity for the limited purpose of deciding motive and evaluating the credibility of a witness. The jury was also instructed that it may not consider the evidence for any other purpose and cannot conclude from this evidence that Armenta was a person of bad character or that he had a disposition to commit the crime. (CALCRIM No. 303.)

*2. Analysis*

The prosecution is "generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31 (*Chhoun*).) Relevant evidence on issues such as motive and identity can include "[e]vidence of the defendant's gang

11

affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) "Even when it is relevant, however, 'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." ' [Citations.]" (*Chhoun*, at p. 31.) Relevant evidence is admissible if the probative value is not substantially outweighed by its prejudicial effect. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.) We review the admission of gang evidence for abuse of discretion. (*Ibid.*)

Armenta acknowledges *People v. Burgos* (2024) 16 Cal.5th 1, 23, which recognized that gang evidence used to prove a gang enhancement might also be admissible at a trial on the underlying charge. He also acknowledges that "some, limited amount of gang evidence" here was relevant to prove motive. However, he argues that other gang evidence, such as predicate offenses and patterns of criminal gang activities, was inadmissible at the guilt phase at trial.

Even if the court erred in admitting some gang evidence, we conclude any error is harmless given the overwhelming evidence of guilt in this case. It was undisputed that Armenta associated with Squires gang members, a rival of the SS gang. His cell phone records including his call records and location history, Gile's testimony, surveillance video evidence, and Armenta's flight to San Bernardino after the shooting all support his conviction. In our view, it is not reasonably likely that exclusion of some of the gang evidence would have changed the jury's verdict. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1210;

12

*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Furthermore, the trial court gave limiting instructions. We presume the jury understood and followed them. (*Chhoun*, *supra*, 11 Cal.5th at p. 30.)[4]

Armenta compares this case to *People v. Albarran* (2007) 149 Cal.App.4th 214, 232 which presented "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." In *Albarran*, two men shot at a house during a party. (*Id.* at p. 217.) The gang motive was "not apparent from the circumstances of the crime," but the trial court allowed a "panoply of incriminating gang evidence" against the defendant. (*Id.* at p. 227.) Gang evidence such as the identity of other gang members, the crimes they had committed, and the contacts police had with other gang members, may have been "tangentially relevant to the gang allegations, but had no bearing on the underlying charges." (*Ibid.*) Such evidence was prejudicial as its "paramount function . . . was to show Albarran's criminal disposition" and not to prove motive. (*Id.* at p. 228.)

Unlike *Albarran*, the underlying gang-related motivation here was clear, and the gang evidence was proffered for the purpose of proving such motive and intent for the shootings. "While not itself an element of the crimes, motive can illuminate intent." (*Chhoun*, *supra*, 11 Cal.5th at p. 32.) Any error in admitting gang evidence did not result in a violation of Armenta's right to due process.

---

[4] For these reasons, *People v. Garcia* (2024) 107 Cal.App.5th 1040 does not persuade us otherwise.

13

*"Kill zone" instruction*

Armenta contends the attempted murder conviction should be reversed because the evidence did not support a kill zone instruction and the instruction was legally incorrect. Although the trial court erred, we conclude the error was not prejudicial.

*1. Relevant proceedings*

The trial court instructed the jury with CALCRIM No. 600, attempted murder, which states, in part:

> "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] . . . [¶]

> "A person may intend to kill a primary target and also a secondary target within a zone of fatal harm or 'kill zone.' A 'kill zone' is an area in which the defendant used lethal force that was designed and intended to kill everyone in the area around the primary target.

> "In order to convict the defendant of the attempted murder of Alvaro Hernandez, the People must prove that the defendant not only intended to kill Alvaro Hernandez but also either intended to kill Alvaro Hernandez, or intended to kill everyone within the kill zone.

> "In determining whether the defendant intended to kill Alvaro Hernandez, the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone; and (2) Alvaro Hernandez was located within the kill zone.

14

"In determining whether the defendant intended to create a 'kill zone' and the scope of such a zone, you should consider all of the circumstances including, but not limited to, the following: [¶] The type of weapon used; [¶] The number of shots fired; [¶] The distance between the defendant and Alvaro Hernandez.

"If you have a reasonable doubt whether the defendant intended to kill Alvaro Hernandez or intended to kill Alvaro Hernandez by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Alvaro Hernandez."

During closing argument, the prosecutor argued that Armenta intended to kill Hernandez and took multiple direct steps, including running and shooting. She said Hernandez was "lucky" because he was "standing next to Cristobal Gonzalez. Cristobal is the one that got it to the back of the head and Alvaro was able to escape." She also highlighted the surveillance video depicting the shooting as evidence that Armenta took direct steps towards the offense.

The prosecutor alternatively argued the kill zone theory, stating that if "Cristobal Gonzalez was the primary target and Alvaro was in that zone, he's also guilty of attempted murder. And I submit to you the defendant intended to kill Alvaro as well. He wanted to kill them both." "But even if you think maybe he just intended to kill Cristobal, there is a kill zone where if you're in the zone, you are still liable for your actions. It's designed so if you intend to kill one person, the people are also put into that target. So we must prove that he intended to kill Alvaro Hernandez or he intended to kill everyone in that zone. And he did. You don't unload 15 rounds into a residential neighborhood without wanting to kill somebody or all of them and he was mad

15

that his family was being disrespected." "The only reasonable conclusion from the defendant's use of lethal force is that the defendant intended to create a kill zone. That's his conduct and he was located within it. Alvaro was standing right next to Cristobal when they were shot at."

### 2. *Analysis*

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).) "When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Ibid.*)

Our Supreme Court has recognized the concept of a "concurrent intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder." (*Canizales*, *supra*, 7 Cal.5th at p. 602, italics omitted.) Under a kill zone theory, if the defendant intended to target a specific person by killing everyone in the area in which the targeted person was located (i.e., the kill zone), the defendant can be convicted of the attempted murder of persons within that kill zone. (*People v. Bland* (2002) 28 Cal.4th 313, 330-331.)

Recognizing the potential misapplication of the kill zone theory, our high court in *Canizales* held that the kill zone theory may properly be applied "only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are

16

such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607; *People v. Hin* (Feb. 3, 2025, S141519) __ Cal.App.5th __ [2025 WL 457799 at p. *27].) The "kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant *has a primary target* and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Canizales*, at p. 607, italics added.)

*Canizales* emphasized that when "the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, . . . *evidence of a primary target is required.*" (*Canizales*, *supra*, 7 Cal.5th at p. at 608, italics added.) " '[W]ithout a primary target, there cannot be concurrent intent because there is no primary intent to kill as to which the intent to kill others could be concurrent.' " (*Id*. at p. 609; *People v. Mumin* (2023) 15 Cal.5th 176, 193 ["Without substantial evidence showing the defendant acted with intent to kill a primary target, the essential basis for a concurrent intent analysis is not satisfied"].)

17

We conclude there was not substantial evidence to support a kill zone instruction because there was no evidence Armenta intended to kill a primary target. The evidence established that Armenta told Giles that someone was at his uncle's house being disrespectful, but he did not specify who. There was no evidence Armenta knew Gonzalez or Hernandez, other than the fact that they were SS members. Armenta fired 15 times towards Gonzalez or Hernandez, but the evidence does not support he targeted any person in particular. Without evidence of a primary target, it was improper to instruct on the kill zone. (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

Having concluded the court erred in instructing the jury on a kill zone theory, we must decide if this error requires reversal of count 2. We conclude the error is harmless under either *Watson*, *supra*, 46 Cal.2d at page 836 or *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) because there is overwhelming evidence that Armenta specifically intended to murder Hernandez. Armenta shot 15 times towards the direction of Gonzalez and Hernandez, who were standing next to each other at the dead end of Howell Road. Because Armenta repeatedly shot at rival gang members indiscriminately, the evidence established the specific intent to kill required for attempted murder. (See *People v. Medina* (2019) 33 Cal.App.5th 146, 156.)

In *People v. Stone*, our high court held that "a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*People v. Stone* (2009) 46 Cal.4th 131, 140 [attempted murder conviction upheld where the defendant fired into a group of 10 rival gang members about 60 feet away].) *Canizales* also

18

recognized that "there are evidentiary bases, other than the kill zone theory, on which a fact finder can infer an intent to kill for purposes of attempted murder liability that do not depend on a showing that the defendant had a primary target (for example, when a terrorist places a bomb on a commercial airliner intending to kill as many people as possible without intending to kill a specific individual)." (*Canizales*, *supra*, 7 Cal.5th at p. 608.)

The prosecutor here pursued a theory as described in *Stone*. She argued Armenta "wanted to kill them both" and "[y]ou don't unload 15 rounds into a residential neighborhood without wanting to kill somebody or all of them and he was mad that his family was being disrespected." The facts here do not present a scenario in which an intent to kill one victim was clearer than an intent to kill another. There was no evidence of a primary target. But the evidence overwhelmingly established that Armenta indiscriminately shot at Gonzalez and Hernandez, who were standing next to each other, and intended to kill both of them. Under these facts, we conclude the instructional error is harmless beyond a reasonable doubt.

*Firearm enhancement*

Armenta contends the enhancement on count 2 for the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)) must be vacated because the verdict form does not reflect that the jury made a finding on the firearm enhancement as alleged in the information. We conclude such error does not warrant reversal here. " ' " 'A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court.' [Citations.]" [Citations.]' " (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272.) The jury found true that Armenta personally and

19

intentionally discharged the firearm in the verdict form.  The additional language in the verdict form that the discharge of the firearm "caused great bodily injury or death" was mere "surplusage that may be disregarded." (*Ibid*.)

*Gang enhancement*

After Armenta's trial, our Supreme Court decided *People v. Clark* (2024) 15 Cal.5th 743 (*Clark*).  *Clark* analyzed the language of section 186.22, as amended by Assembly Bill No. 333 (2021-2022 Reg. Sess.) and interpreted "collective engagement" to require "a nexus between the individual predicate offenses and the gang as an organized, collective enterprise." (*Clark*, at p. 749.)  *Clark* applies retroactively. (*People v. Guerra* (1984) 37 Cal.3d 385, 399-400.)

Armenta argues the gang enhancement must be reversed because the jury was not instructed on *Clark*'s organizational nexus requirement and there was no evidence of a nexus between the predicate offenses and the gang as an organized collective enterprise.  The Attorney General contends the lack of instruction was harmless beyond a reasonable doubt.  We agree with the Attorney General.

Assembly Bill No. 333 amended section 186.22 to define "criminal street gang" as an "ongoing, organized association . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added; Stats. 2021, ch. 699, § 4.)  Interpreting this amendment, *Clark* concluded the "Legislature's reference to collective engagement . . . calls for an inquiry not just into how the predicate offenses benefited the gang, but also how the gang works together *as a gang*.  It calls for a showing of a connection, or nexus, between an offense committed by one or more gang

20

members and the organization as a whole." (*Clark*, *supra*, 15 Cal.5th at p. 762.) "This organizational nexus may be shown by evidence linking the predicate offenses to the gang's organizational structure, meaning its manner of governance; its primary activities; or its common goals and principles." (*Ibid.*)

Collective engagement can be established in different ways. (*Clark*, *supra*, 15 Cal.5th at p. 762.) Examples of collective engagement include evidence of a direct order from the gang to commit a crime, a more "general, well-understood expectation that members must engage in certain types of offenses," or a demonstration that the offenses are reflective of the primary activities of the gang or else adhere to a common goal or plan characteristic of the gang in question. (*Ibid.*)

*Clark* emphasized that the "collective engagement" requirement was "conceptually distinct" from the "common benefit" requirement. However, the "facts necessary to prove the two requirements will often overlap with one another." (*Clark*, *supra*, 15 Cal.5th at p. 763.) The core inquiry for the collective engagement element is "whether there exists an organizational nexus between the crime and the gang." (*Ibid.*)

A trial court has a sua sponte obligation to provide correct instructions of law. (*People v. Mil* (2012) 53 Cal.4th 400, 409.) When jury instructions fail to account for new elements that apply retroactively, a defendant is entitled to a remand for further proceedings unless the error is harmless beyond a reasonable doubt. (*Clark*, *supra*, 15 Cal.5th at p. 763; *Chapman*, *supra*, 386 U.S. at p. 24.) "[I]nstructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' " (*Mil*, at p. 417.)

21

We conclude the lack of instruction was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.) There was overwhelming and uncontroverted evidence of the organizational nexus "linking the predicate offenses to the gang's organizational structure, meaning its . . . primary activities; or its common goals and principles." (*Clark*, *supra*, 15 Cal.5th at p. 762.) Detective Vega testified that the Squires's primary activities included carrying and possessing firearms. He testified that gang members carry firearms in their own neighborhood in case a violent confrontation arises against a rival gang. The evidence established that active Squires members, Juarez and Apodaca, committed predicate crimes reflective of the Squires's primary activities and in furtherance of a common goal (i.e., defending the gang's territory). As Detective Vega explained, Juarez was defending Squires turf. He was in Squires territory with other Squires gang members shortly after a shooting had occurred between a rival gang in the neighborhood. The evidence also established that Apodaca's predicate offense of being a prohibited person possessing a firearm was reflective of the gang's primary activity. He was with other Squires members and associates and training them to use firearms so that they could defend their turf in future confrontations. This evidence established that the two predicate offenses not only benefited the gang but was linked to the gang's organizational structure, including its primary activities and common goals. Reversal of the gang enhancement under section 186.22, subdivision (b)(1)(C) is thus unwarranted.

### Cumulative error

Armenta contends cumulative error deprived him of due process and a fair trial. We are not persuaded. We have rejected

22

Armenta's contention that the trial court abused its discretion in denying his request to substitute new counsel and continue trial. We have also concluded any error regarding the gang evidence in the prosecution's case-in-chief and the instructional error on the kill zone instruction were harmless. Error regarding the gang enhancement only pertained to the bifurcated portion of the trial, and we have concluded that it, too, was harmless. "Defendant was entitled to a fair trial, not a perfect one." (*People v. Cain* (1995) 10 Cal.4th 1, 82.)

*Senate Bill 81*

Armenta contends resentencing is required under Senate Bill 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1). Effective January 1, 2022, Senate Bill 81 amended section 1385 to specify factors a trial court must consider when deciding whether to strike enhancements in the interest of justice. (§ 1385, subd. (c)(7); *People v. Sek* (2022) 74 Cal.App.5th 657, 674.) The Attorney General acknowledges that Senate Bill 81 was effective during Armenta's sentencing, but contends remand for resentencing is not warranted. We agree with the Attorney General. The court declined the invitation to strike the punishment for the firearm enhancement (§ 12022.53, subd. (d)) because it found Armenta's conduct "extreme." It concluded, "I'm satisfied that this should be the sentence as pronounced." The record "clearly indicates" the trial court would not strike the firearm enhancement in light of Senate Bill 81. (*People v. Salazar* (2023) 15 Cal.5th 416, 424.)[5]

---

[5] We reject Armenta's ineffective assistance of counsel claim because he cannot show he was prejudiced by counsel's failure to object. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-685, 700.) The court rejected counsel's request for a lesser

23

*Abstract of judgment*

Both parties contend the abstract of judgment must be corrected. We agree. The concurrent sentence on count 2 was life with the possibility of parole after 15 years (§ 186.22, subd. (b)(1)(5)) and 20 years pursuant to the firearm enhancement (§ 12022.53, subd. (c)). However, the abstract of judgment incorrectly reflects the firearm enhancement as "20 to life." The abstract of judgment must be corrected to reflect "20 years."

The abstract of judgment also reflects an error in custody credits. The trial court pronounced Armenta was entitled to 705 days of credit served. The abstract of judgment reflects 1,004 days of credit, consisting of 705 actual days served and 299 days of conduct credit. But a person convicted of murder is prohibited from accruing presentence conduct credits. (§ 2933.2; see *People v. Chism* (2014) 58 Cal.4th 1266, 1336.) The 299 days of conduct credit must be stricken.

## DISPOSITION

The judgment is modified (1) to reflect the concurrent sentence for the firearm enhancement (§ 12022.53, subd. (c)) in count 2 to be 20 years, and (2) to strike the 299 days of conduct credit for a total of 705 days of presentence credit. The trial court shall prepare an amended abstract of judgment and forward a

sentence or probation, and it clearly indicated that it would impose the 50-year-to-life sentence regardless of its discretion to impose a lesser sentence.

copy to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.


We concur:



YEGAN, Acting P. J.



CODY, J.


25

David R. Worley, Judge

Superior Court County of Ventura

_____

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.